Arthur C. HAWKINS, Petitioner–
Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–
Appellee.

Glenda R. HAWKINS, Petitioner–
Appellee,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–
Appellant.

Nos. 94–9009, 94–9011.

United States Court of Appeals,
Tenth Circuit.

June 14, 1996.

Douglas G. Schneebeck of Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, New Mexico, (Stuart R. Butzier, with him on the brief), for Petitioner–Appellant Arthur C. Hawkins.

Patricia Tucker of Laflin, Lieuwen, Tucker, Pick & Heer, P.A., Albuquerque, New Mexico, for Petitioner–Appellee Glenda R. Hawkins.

Robert W. Metzler, United States Department of Justice, Tax Division, Washington, DC, (Loretta C. Argrett, Assistant Attorney General, and Kenneth L. Greene, with him on the brief), for Respondent–Appellee/Respondent–Appellant Commissioner of Internal Revenue.

Before EBEL and HOLLOWAY, Circuit Judges, and BROWN, District Judge.[*]

EBEL, Circuit Judge.

These two consolidated appeals present the question whether husband or wife should bear the income tax burden of a $1 million pension distribution made to the wife pursuant to a marital dissolution decree. Resolution of this question turns on whether the marital settlement agreement incorporated into the parties' dissolution decree constitutes a "qualified domestic relations order" ("QDRO") within the meaning of section 414(p) of the Internal Revenue Code. 26 U.S.C. § 414(p). The Tax Court below held that the incorporated settlement agreement did not satisfy the statutory definition of a QDRO and ordered the husband to pay the tax. *Hawkins v. Commissioner*, 102 T.C. 61, 1994 WL 26316 (1994). We have jurisdiction under 26 U.S.C. § 7482(a)(1) and now reverse.

## BACKGROUND

Appellant Arthur C. Hawkins ("Arthur") and Appellee Glenda R. Hawkins ("Glenda") were married on July 17, 1965. Arthur, an orthodontist, was the president and sole shareholder of Arthur C. Hawkins, D.D.S., P.A., a New Mexico professional corporation. In 1972, Arthur established the Arthur C. Hawkins, D.D.S. Pension Plan (the "Plan") for the benefit of the corporation's employees, and named himself the sole trustee and administrator of the Plan. As of July 31, 1986, the value of Arthur's accrued benefit under the Plan was $1,072,932.97.

On January 5, 1987, Arthur and Glenda entered into a Marital Settlement Agreement (the "Agreement") as part of a divorce proceeding pending in the Second Judicial District Court, County of Bernalillo, State of New Mexico (the "divorce court"). The provisions of the Agreement were incorporated by reference into the final marital dissolution decree issued by the divorce court on January 7, 1987 (the "Dissolution Decree"). The relevant portions of the Agreement provide as follows:

6. *WIFE'S COMMUNITY PROPERTY:* As a compromise distribution of the community property, [Glenda] shall receive as her separate property:

(a) Cash of One Million Dollars ($1,000,000.00) from [Arthur]'s share of the Arnation.

---

[*] The Honorable Wesley E. Brown, Senior District Judge of the District of Kansas, sitting by desig-

thur C. Hawkins, D.D.S. Pension Plan. . . .

. . . .

7. *HUSBAND'S COMMUNITY PROP- ERTY:* As a compromise distribution of the community property, [Arthur] shall receive as his separate property: . . .

(*l*) A.C. Hawkins, D.D.S., P.A., including all equipment, accounts receivable, inventory, goodwill and pension plan, net value, approximately $294,000.

. . . .

9. *WIFE'S COMMUNITY DEBTS:* [Glenda] assumes, shall timely pay and shall hold [Arthur] harmless for the following debts: . . . .

(b) [t]he tax obligation an [sic] any asset or proceeds which she is receiving pursuant to this Agreement;

. . . .

12. *GENERAL PROVISIONS:* . . .

H. *Transfer of Property:* Each party shall immediately allow the other to take possession of the property transferred to that party by this Agreement.

(Appellant App. at 257–261.)

■ The $1 million cash payment referred to by Paragraph 6(a) of the Agreement was paid to Glenda in installments between January 7, 1987, and March 16, 1987. These installments were paid by checks written on the Plan's bank account. Upon receipt of these payments, Glenda did not redeposit the funds into the Plan, nor did she roll the funds over into any other qualified plan within the sixty day grace period allowed by 26 U.S.C. § 402(a)(5).[1] Neither Arthur nor Glenda reported the payment as income on their separately filed 1987 federal income tax returns.

■ Ordinarily, any funds distributed from a qualifying pension plan are taxable to the plan participant or beneficiary who, under the plan, is entitled to receive the distri-

bution. *Darby v. Commissioner,* 97 T.C. 51, 58, 1991 WL 134804 (1991). Yet under section 402(a)(9) of the Code,[2] the "spouse or former spouse" of the plan participant who receives "any distribution or payment made . . . under a qualified domestic relations order (as defined in section 414(p))" shall be considered an "alternate payee" and taxed on such distribution or payments as the distributee. I.R.C. § 402(a)(9). Accordingly, the tax liability for the $1 million distribution from Arthur's Plan will be allocated either to Arthur or Glenda depending upon whether the Agreement as incorporated into the Dissolution Decree satisfies the statutory definition of a QDRO. A domestic relations order qualifies as a QDRO under the Code only if it: (1) creates, recognizes or assigns to an alternate payee the right to receive all or a portion of the benefits payable under a plan; (2) clearly specifies certain information about the plan; and (3) does not alter in a prohibited manner the amount or form of the benefits payable under the plan. I.R.C. § 414(p)(1)-(3).

Concerned that he might be taxed on the $1 million distribution, Arthur filed a Motion for Entry of Qualified Domestic Relations Order *nunc pro tunc* with the divorce court in March 1989. In this motion, Arthur argued that because the Agreement was intended to be a QDRO, Glenda was liable for the tax on the distribution. Arthur therefore asked the court to enter a QDRO *nunc pro tunc* to the date of the divorce. In the alternative, Arthur argued that Glenda was liable for the tax under Paragraph 9 of the Agreement, which provides that Glenda "assumes, shall timely pay and shall hold [Arthur] harmless for . . . [t]he tax obligation . . . [on] any asset or proceeds which she is receiving pursuant to this Agreement."

In an order filed August 2, 1989, the divorce court denied Arthur's motion on all

---

1. Although a qualified pension plan is exempt from taxation under 26 U.S.C. § 501(a), any amounts actually distributed from such a plan must be included in the distributee's gross income. 26 U.S.C. § 402(a)(1). In order to avoid the tax bite of a plan distribution, the distributee may "roll over" the amount of the distribution into another eligible plan within sixty days. 26 U.S.C. § 402(a)(5)(A)-(C). Failure to make a timely rollover of distributed funds constitutes a taxable event.

2. All statutory references are to the Internal Revenue Code of 1986, as amended and in effect during the year at issue in this case (the "Code" or "I.R.C."), 26 U.S.C. § 1, *et seq.,* unless otherwise indicated.

grounds. First, the court found that nothing in the Agreement specified that a QDRO was intended by the parties, or that Glenda was intended to be an alternate distributee of the Plan. Second, because it had not retained any jurisdiction over the Agreement (other than to enforce its literal terms and to modify child custody issues), the court held that it had no jurisdiction to enter a QDRO *nunc pro tunc* to the date of the original divorce decree. Finally, the court refrained from ruling on Arthur's request to enforce Paragraph 9 of the Agreement so as to require Glenda to pay tax on the $1 million distribution on the ground that the Commissioner of Internal Revenue ("Commissioner") had not yet assessed a deficiency in either Arthur or Glenda's 1987 income tax and thus the issue of enforcing the Agreement was not ripe.

Subsequent to the divorce court proceeding, the Commissioner issued notices of deficiency to both Arthur and Glenda. The notices required Arthur and Glenda each to include the distribution in their gross income for 1987. After receiving the notices, Arthur and Glenda both filed petitions in the United States Tax Court challenging the assessed deficiencies. In an order dated March 23, 1993, the Tax Court consolidated the two cases for decision. The parties' principal dispute in the Tax Court proceeding was whether the Agreement incorporated into the Hawkins' marital dissolution decree was a QDRO. In addition, Glenda and the Commissioner argued that Arthur was collaterally estopped from relitigating the QDRO issue by virtue of the divorce court's August 2, 1989 order. On cross-motions for summary judgment, the Tax Court held that because the QDRO question was not definitively decided by the divorce court's August 2, 1989 order, Arthur was not precluded from relitigating it. *Hawkins,* 102 T.C. at 68–70. However, the Tax Court ultimately concluded that the Agreement was not a QDRO and granted Glenda's motion for summary judgment against the Commissioner. *Id.* at 70–77. Correspondingly, the court granted the

Commissioner's motion for summary judgment against Arthur and ordered Arthur to include the $1 million in his gross income for 1987. *Id.*

On June 9, 1994, Arthur filed a timely notice of appeal from the Tax Court's order. As a protective measure, the Commissioner also appealed the grant of summary judgment in favor of Glenda. The Commissioner takes no position on the merits of these consolidated appeals, contending simply that either Arthur or Glenda is taxable on the distribution. Thus, the Commissioner argues, if we reverse the grant of summary judgment in Arthur's case, we should grant summary judgment in favor of the Commissioner in Glenda's case.[3]

## DISCUSSION

 We review decisions of the United States Tax Court "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." I.R.C. § 7482(a). Accordingly, we review purely factual issues for clear error, and purely legal questions under the *de novo* standard. *National Collegiate Athletic Ass'n v. Commissioner,* 914 F.2d 1417, 1420 (10th Cir.1990). We also review *de novo* the use of collateral estoppel to bar relitigation of an issue. *Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 894 (10th Cir.1994).

## I.

 Glenda first contends that Arthur is precluded from arguing that the Agreement is a QDRO because the New Mexico divorce court considered and rejected this same argument in 1989. Under the Full Faith and Credit statute, federal courts are required to give a state court judgment the same preclusive effect as the state rendering the judgment would have given. 28 U.S.C. § 1738; *Franklin v. Thompson,* 981 F.2d 1168, 1170 (10th Cir.1992). We must therefore determine whether the issue preclusion principles

---

**3.** The Commissioner justifies her apparent "disinterest" in these cases by pointing out, correctly, that the primary administrative and interpretive jurisdiction over the QDRO definition resides with the Department of Labor rather than the Department of the Treasury, *see* I.R.C. §§ 401(n), 414(p)(11) (1988) (currently codified at I.R.C. § 414(p)(12)), and further, that the Secretary of Labor has not yet provided administrative guidance with respect to the QDRO definition.

followed by New Mexico courts would bar Arthur from relitigating the QDRO issue.

■ New Mexico courts traditionally require the presence of four elements to successfully invoke collateral estoppel: (1) the parties are the same or are privies of the original parties; (2) the cause of action is different; (3) the issue or fact was actually litigated; and (4) the issue was necessarily determined. *Amoco Prod. Co. v. Heimann*, 904 F.2d 1405, 1417–18 (10th Cir.) (citing *International Paper Co. v. Farrar*, 102 N.M. 739, 700 P.2d 642, 644–45 (1985)), *cert. denied*, 498 U.S. 942, 111 S.Ct. 350, 112 L.Ed.2d 314 (1990). Here, the divorce court judgment does not preclude litigation of the QDRO issue in this case because the precise statutory question whether the Agreement was a QDRO was neither actually litigated nor necessarily decided in the divorce court proceeding. The divorce court decided only whether the Hawkins' Agreement was *intended* to be a QDRO; it did not determine whether the Agreement itself satisfied the statutory definition of a QDRO.

The factual findings made by the divorce court in its August 2, 1989 order make clear that the court considered only whether Arthur and Glenda intended the Agreement to be a QDRO and, if not, whether the court possessed jurisdiction under its previous decree to enter a QDRO after the fact. Nowhere in its order did the divorce court discuss the specific statutory criteria for the creation of a QDRO. The court simply concluded that the parties did not contemplate the creation of a QDRO, and that it lacked jurisdiction to modify the original Dissolution Decree which had incorporated the parties' Agreement. We agree with the Tax Court below that when a "statute allows parties to a marital settlement agreement to allocate the tax burdens between them by the use of particular language, the intentions of the parties are not controlling." *Hawkins*, 102 T.C. at 70 (citing *Commissioner v. Lester*, 366 U.S. 299, 304–05, 81 S.Ct. 1343, 1346–47, 6 L.Ed.2d 306 (1961)). Because the divorce

court order did not address the legal effect of the incorporated Agreement under I.R.C. § 414(p)(1)-(3), it cannot operate to preclude Arthur from raising the QDRO issue in this proceeding.

**II.**

■ Before we turn to the central question whether the Hawkins' Agreement is a QDRO, a brief overview of the applicable Code sections is necessary. We begin our statutory odyssey with sections 401 and 402 of the Code, which govern the taxation of distributions from an employees' pension trust. Generally, if an employer makes a contribution for the benefit of an employee to a qualified pension trust which meets the requirements of section 401(a) and which is exempt from tax under section 501(a),[4] the employee is not required to include this contribution in his or her gross income for that taxable year. 26 C.F.R. § 1.402(a)–1(a) (1995). However, any amount actually distributed from a qualifying pension trust to a "distributee" must be included in the distributee's gross income for that year. I.R.C. § 402(a)(1). Although neither the Code nor the applicable Treasury Regulations define the term "distributee" as used in section 402(a)(1), the general rule is that the "distributee" of funds from a qualifying pension plan is the participant or beneficiary who is entitled to receive the distribution under the terms of the plan. *See Darby v. Commissioner*, 97 T.C. 51, 58, 1991 WL 134804 (1991). Section 402(a)(9) states an exception to this general rule, providing that an "alternate payee who is the spouse or former spouse of the participant shall be treated as the distributee of any distribution or payment made to the alternate payee under a qualified domestic relations order." I.R.C. § 402(a)(9); *Hawkins v. Commissioner*, 102 T.C. 61, 66, 1994 WL 26316 (1994). As a result, the legal characterization of whether a particular document is a QDRO will determine whether a plan participant (*e.g.*, Arthur) or the participant's "spouse or former spouse" who is awarded benefits under a

---

**4.** Section 401(a) of the Code sets forth the necessary criteria to create a "qualified trust," and section 501 makes such qualified trusts exempt from taxation. The Commissioner determined,

and the parties do not dispute, that the Plan at issue in this case is a qualified pension trust under section 401(a) which is tax exempt under section 501(a).

qualified plan (*e.g.*, Glenda) will be the "distributee" and thus incur the tax liability of a pension plan distribution.

 The QDRO has an additional function besides tax allocation; indeed, the legislative history demonstrates that the primary purpose of the QDRO exception was to enable plan participants to assign or alienate their plan interests in connection with a domestic relations order. Prior to 1974, a participant's interest in a tax-exempt pension plan was freely assignable under the Code. However, the enactment of the Employee Retirement Income Security Act of 1974 ("ERISA") changed existing law by providing that benefits obtained "under [a qualifying pension] plan may not be assigned or alienated." Pub.L. No. 93–406, § 206(d)(1), 88 Stat. 864 (1974) (codified at I.R.C. § 401(a)(13)(A) and 29 U.S.C. § 1056(d)(1)). This so-called "spendthrift" provision of ERISA was intended to "protect an employee from his own financial improvidence in dealings with third parties," *American Tel. & Tel. Co. v. Merry,* 592 F.2d 118, 124 (2d Cir.1979), and to ensure "that the employee's accrued benefits are actually available for retirement purposes," H.R.Rep. No. 807, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 4670, 4734. ERISA also added a section giving certain parts of the statute (including the spendthrift provision) preemptive effect over contrary state law. *See* 29 U.S.C. § 1144(a).

Following the enactment of ERISA, courts were divided on the question whether the spendthrift provision preempted state domestic relations laws permitting the attachment of plan benefits for the purpose of meeting domestic support obligations. *See* S.Rep. No. 575, 98th Cong., 2d Sess. 20 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547, 2566 (recognizing conflicting authority). *Compare Francis v. United Tech. Corp.,* 458 F.Supp. 84, 85–86 (N.D.Cal.1978) (ERISA spendthrift provision preempts the application of state community property law permitting division of plan benefits for domestic support purposes) *with American Tel. & Tel.*

*Co. v. Merry,* 592 F.2d 118 (2d Cir.1979) (holding that Congress did not intend ERISA to preempt state laws allowing the attachment of plan benefits in order to satisfy family support obligations). This judicial rift was addressed by Congress in the Retirement Equity Act of 1984 ("REA"), Pub.L. No. 98–397, 98 Stat. 1426. The REA created a limited exception to the spendthrift provision of ERISA that permits qualified pension plan benefits to be divided pursuant to "qualified domestic relations orders." *See* I.R.C. § 401(a)(13)(B); 29 U.S.C. § 1056(d)(3).[5] Thus, a marital dissolution decree that does not fall within the limited QDRO exception is preempted by ERISA, and any assignment of pension interests under such an order is unenforceable, even if intended as part of a family support order. *See Metropolitan Life Ins. Co. v. Wheaton,* 42 F.3d 1080, 1083 (7th Cir.1994) (involving a welfare plan rather than a pension plan).

As the foregoing discussion demonstrates, the technical definition of a QDRO assumes great significance not only with respect to marital property and employee benefits taxation, but also with respect to domestic support obligations. *See Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 838–39, 108 S.Ct. 2182, 2190–91, 100 L.Ed.2d 836 (1988) (noting that the "primary focus" of the QDRO exception was to allow alienation of "pension plan benefits when spouses sought enforcement of domestic support orders"). This definition is set forth in section 414(p) of the Code, which provides in relevant part:

**(p) Qualified domestic relations order defined.**—For purposes of this subsection and section 401(a)(13)—

**(1) In general.**—

**(A) Qualified domestic relations order.**—The term "qualified domestic relations order" means a domestic relations order—

**(i)** which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of

---

**5.** The QDRO exception recognized by the REA is codified in both the labor code and the tax code. The Commissioner concedes that because the two parallel provisions were created by the same legislative act and contain precisely the same language, they are interpreted identically.

the benefits payable with respect to a participant under a plan, and

(ii) with respect to which the requirements of paragraphs (2) and (3) are met.

. . . .

**(2) Order must clearly specify certain facts.**—A domestic relations order meets the requirements of this paragraph only if such order clearly specifies—

(A) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(B) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(C) the number of payments or period to which such order applies, and

(D) each plan to which such order applies.

**(3) Order may not alter amount, form, etc., of benefits.**—A domestic relations order meets the requirements of this paragraph only if such order [does not alter in a prohibited manner the amount or form of benefits].

. . . .

**(8) Alternate payee defined.**—The term "alternate payee" means any spouse, former spouse, child or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant.

I.R.C. § 414(p)(1)-(3), (8).

Glenda argues that the Agreement incorporated into the Hawkins' Dissolution Decree is not a QDRO because: (1) it does not create, recognize or assign to her the right to receive benefits under the Plan as required by section 414(p)(1)(A)(i); and (2) it does not "clearly specify certain facts" as required by section 414(p)(2). We address each of these contentions in turn.

**A.**

■ Paragraph 6(a) of the Agreement states that Glenda "shall receive as her separate property . . . [c]ash of One Million Dollars ($1,000,000.00) from Husband's share" of the Plan. The Tax Court concluded that this language did not satisfy section 414(p)(1)(A)(i)'s requirement that a domestic relations order "create[ ] or recognize[ ] the existence of an alternate payee's right to, or assign[ ] to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." The Tax Court reasoned as follows:

> We do not believe that identifying the pension plan as the source of the $1 million cash payable to Mrs. Hawkins necessarily created, recognized, or assigned rights to her, as an alternate payee, in the benefits payable under the pension plan. The settlement agreement did not refer to her as an alternate payee, and any indication therein that she was to be taxable on the distribution, as an alternate payee would be, was ambiguous at best.

*Hawkins*, 102 T.C. at 74. We believe the Tax Court's reading of section 414(p)(1)(A)(i) is unduly narrow for two reasons. First, it erroneously assumes that in order to create a QDRO, the parties to an agreement must express their intent to reallocate the tax burden of a pension distribution. Second, the Tax Court's interpretation reads into section 414(p)(1)(A)(i) a requirement that the parties incorporate the exact statutory terminology when drafting a domestic relations order. Because section 414(p)(1)(A)(i) requires neither of these things, we believe the Tax Court's interpretation runs counter to the plain meaning of the statute.

■ Nothing in the statute requires the parties to a marital settlement agreement to indicate unambiguously their desire to shift the tax consequences of a particular distribution. Allocation of tax liability between the parties is a *consequence* of having a QDRO; yet it is not a prerequisite to the creation of a QDRO that the parties intend this allocation. Whether a domestic relations order qualifies as a QDRO depends on the language of the order itself; the subjective

intentions of the parties are not controlling. *Cf. Commissioner v. Lester,* 366 U.S. 299, 304–05, 81 S.Ct. 1343, 1346–47, 6 L.Ed.2d 306 (1961).

■ We also reject the Tax Court's interpretation that section 414(p)(1)(A)(i) requires the parties to a domestic relations order to employ the term "alternate payee" in order to create a QDRO.[6] Nothing in the plain language of section 414(p)(1)(A)(i) exhorts domestic relations lawyers literally to mimic the statutory language when drafting these agreements. Section 414(p)(1)(A)(i) simply requires the parties to execute a document which either "creates," "recognizes," or "assigns" rights under a qualifying plan to an alternate payee. We believe the language contained in the Hawkins' Agreement adequately accomplishes this purpose.

■ By expressly stating that Glenda "shall receive" $1 million "from" the Plan, Paragraph 6(a) of the Agreement plainly "creates or recognizes" a contractual right in Glenda as an alternate payee to receive "a portion of the benefits payable" under the Plan. I.R.C. § 414(p)(1)(A)(i). Additionally, Glenda does in fact come within the statutory definition of an "alternate payee," even though she was not specifically designated as such in the Agreement. An alternate payee is "any spouse [or] former spouse ... of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." I.R.C. § 414(p)(8). As Arthur's former spouse, Glenda is an "alternate payee" because the Agreement gives her the right to receive "all, or a portion of," Arthur's Plan benefits.[7]

This construction of the Hawkins' Agreement is supported by our decision in *Carland v. Metropolitan Life Ins. Co.,* 935 F.2d 1114 (10th Cir.), *cert. denied,* 502 U.S. 1020, 112 S.Ct. 670, 116 L.Ed.2d 761 (1991). One of the principal issues in *Carland* was whether a state divorce decree that required the husband to name his wife as the primary beneficiary of his insurance policy was preempted by ERISA. The wife argued that the decree in question was a QDRO and thus fell outside of ERISA's preemptive sweep. *Id.* at 1119–20. The relevant language in the *Carland* divorce decree read as follows: "[Husband] is ordered to pay the premiums on, and to make irrevocable designation of [Wife] as the sole primary beneficiary under and of, the policies of insurance on the life of [Husband].…" *Id.* at 1116. The decree did not refer to the wife as the "alternate payee," nor did it utilize the statutory buzzwords "create," "recognize," or "assign" to provide the wife with benefits under the husband's plan. Nevertheless, on these facts, we had little difficulty concluding that "the domestic relations order *recognizes* [the wife's] right to receive policy benefits." *Id.* at 1120 (emphasis added). Accordingly, we believe *Carland* requires us to reject the Tax Court's formalistic reading of section 414(p)(1)(A)(i).

Whereas *Carland* lends support to our conclusion, *Karem v. Commissioner,* 100 T.C. 521, 1993 WL 207685 (1993), cited by Glenda, is inapposite. In *Karem,* a consent judgment was entered by a state divorce court in order to partition the community property of Mr. and Mrs. Karem. 100 T.C. at 523. The consent judgment provided that Mrs. Karem was to receive an interest in her ex-husband's pension plan, but it stated the following condition:

**6.** The Tax Court indicated that the Agreement would have constituted a QDRO had it *"expressly stated that it 'creates and recognizes the alternate payee's right* to One Million Dollars of Arthur C. Hawkins' interest in the Pension Plan.' " *Hawkins,* 102 T.C. at 76–77 (emphasis added).

**7.** Although we find no ambiguity in the language contained in Paragraph 6(a), Glenda contends that we should interpret it to mean that Arthur is personally liable to her for $1 million, and that Arthur was to withdraw the $1 million from the Plan himself before paying it over to her. Under Glenda's interpretation, the Plan was merely the

"source" of the funds to satisfy this generic $1 million obligation. Glenda's interpretation is not, however, a reasonable one. Nowhere does the Agreement state or even imply that Arthur must first withdraw the funds from the Plan himself; rather, Paragraph 6(a) clearly states that Glenda "shall receive [the $1 million] *from* Husband's share" of the Plan. We emphasize here that an "ambiguity in a contract cannot be created by the mere assertions of a party to it." *Castleglen, Inc. v. RTC,* 984 F.2d 1571, 1581 (10th Cir.1993).

She shall receive that interest pursuant to a Qualified Domestic Relations Order to be prepared by Robert Louis Karem. Until the Qualified Domestic Relations Order is completed, Robert Louis Karem shall pay Barbara Wiechman Karem her interest in the pension plan immediately when he receives it.

*Id.* After being assessed a deficiency in his gross income based on a lump-sum plan distribution paid to Mrs. Karem, Mr. Karem filed a petition in the Tax Court arguing that the consent judgment was a QDRO. The court rejected this argument, noting that "the consent judgment *directs* that a QDRO be drafted . . .; the consent judgment itself is not a QDRO." *Id.* at 525–526 (emphasis added). The court also noted that Mrs. Karem received the lump-sum pension benefits more than a year *before* the consent judgment was rendered. *Id.* at 526. Thus, there was no written order in existence at the time of the distribution that would satisfy the requirements of section 414(p) of the Code. Our facts are decidedly different. Unlike the consent judgment in *Karem*, the Agreement incorporated into the Hawkins' Dissolution Decree itself gives Glenda the right to obtain a portion of Arthur's pension benefits;. it does not condition the receipt of those benefits upon the future execution of a QDRO. Moreover, unlike Mrs. Karem, Glenda received her $1 million portion of the Plan benefits after the incorporation of the Agreement into the Dissolution Decree. Glenda's reliance on *Karem* is therefore misplaced.

Finally, we believe the legislative history of the QDRO exception supports our reading of section 414(p)(1)(A)(i). Prior to the enactment of the Retirement Equity Act, some courts had held that state law domestic support orders assigning or attaching pension benefits were preempted by ERISA's spendthrift provision. *See* S.Rep. No. 575, 98th Cong., 2d Sess. 20 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547, 2566 (recognizing conflicting decisions). Congress' primary intent in recognizing the QDRO exception was to clarify that these domestic support obligations did not fall within the scope of ERISA preemption. *See Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 838–39, 108 S.Ct. 2182, 2190–91, 100 L.Ed.2d 836 (1988). The Tax Court's narrow reading of section 414(p) has the potential to frustrate this important congressional purpose by making it unreasonably difficult for domestic relations orders to qualify as QDROs. Under the Tax Court's approach, spouses or children of plan participants would be precluded from receiving intended domestic support payments simply because the particular divorce decree failed to track the language of the statute even though the criteria of the statute were satisfied in substance. *See Metropolitan Life Ins. Co. v. Wheaton,* 42 F.3d 1080, 1085 (7th Cir.1994). Given the important legislative purpose behind the QDRO exception, we do not believe that Congress intended such an undesirable result.

## B.

■ The Tax Court's alternate ground for denying QDRO status to the Hawkins' Agreement was that it did not "clearly specify certain facts" as required by section 414(p)(2). *See Hawkins,* 102 T.C. at 74–76. To qualify as a QDRO under the statute, an order must clearly specify: (1) the name and last known mailing address of the participant and alternate payee; (2) the amount or percentage of the participant's benefits to be paid to the alternate payee, or the manner in which the amount or percentage is to be determined; (3) the number of payments or period to which the order applies; and (4) each plan to which the order applies. I.R.C. § 414(p)(2)(A)-(D).

The purpose of the specificity requirement of section 414(p)(2) is to "reduce the expense of ERISA plans by sparing plan administrators the grief they experience when because of uncertainty concerning the identity of the beneficiary they pay the wrong person, or arguably the wrong person, and are sued by a rival claimant." *Wheaton,* 42 F.3d at 1084 (citing *Carland,* 935 F.2d at 1120). Consistent with this purpose, the Senate Report accompanying the REA legislation suggests that an otherwise qualified order will not fail under section 414(p)(2) "merely because the order does not specify the current mailing address of the participant and alternate payee if the plan administrator has reason to

know of that address independently of the order." S.Rep. No. 575, 98th Cong., 2d Sess. 20 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547, 2566.

 Seizing on this portion of the legislative history, Arthur argues that the requirements of section 414(p)(2) need not be strictly complied with. Rather, he argues, the sufficiency of an order should be evaluated on a case-by-case basis in relation to the subjective knowledge of the plan administrator. In essence, Arthur's argument is that a QDRO need not clearly specify the information required by section 414(p)(2) when the plan administrator, by virtue of his independent knowledge, is already cognizant of that information. Arthur relies on a recent Seventh Circuit decision, *Metropolitan Life Ins. Co. v. Wheaton,* 42 F.3d 1080, 1085 (7th Cir.1994), in which a divorce stipulation was held to be a QDRO even though it did not formally adhere to the section 414(p)(2) specificity requirements.[8] In so holding, the court balked at imposing a strict rule of particularity under section 414(p)(2), reasoning that such a requirement "would defeat the purpose of the provision creating an exception to inalienability for qualified domestic relations orders ... and for a purely theoretical gain in certainty." *Id.* at 1085.

While we are mindful of the Seventh Circuit's concerns, we do not agree that the QDRO specificity requirements should be construed this liberally. First, relaxing the requirements of section 414(p)(2)—or, as *Wheaton* seems to suggest, eliminating them altogether in some cases—does violence to the plain meaning of the statute. Nowhere in section 414(p) has Congress implied that its factual requirements are optional; indeed, the language rather plainly states that a QDRO *"must* clearly specify certain facts." I.R.C. § 414(p)(2) (emphasis added). To accept anything less than what section 414(p)(2) expressly requires would contravene the Supreme Court's frequent admonition that courts must not read language out of a statute. *See, e.g., U.S. Dep't of the*

*Treasury v. Fabe,* 508 U.S. 491, 502–06, 113 S.Ct. 2202, 2209–10, 124 L.Ed.2d 449 (1993); *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 385–86, 112 S.Ct. 2031, 2037–38, 119 L.Ed.2d 157 (1992).

Second, we believe that relaxing the specificity requirements of section 414(p)(2) would involve the courts in precisely the sort of subjective inquiry the statute was designed to avoid: that is, if the specificity requirements are to be evaluated only in light of a plan administrator's subjective knowledge, even the most facially inadequate order could theoretically qualify as a QDRO, so long as the plan administrator was aware of the parties' "true" intentions. *See Hawkins,* 102 T.C. at 75 ("Carrying [this] standard to its logical extreme would suggest that a domestic relations order that makes no mention of the facts required to be specified clearly under section 414(p)(2) is nonetheless a QDRO because the plan administrator independently knew such facts."). As a consequence, disputes over tax allocation will necessarily require inquiry into what the parties intended when drafting the divorce agreement. We do not believe that Congress intended—without expressly saying so—that the precise requirements of section 414(p)(2) could be disregarded in favor of conducting this type of *ad hoc* subjective inquiry.

*Commissioner v. Lester,* 366 U.S. 299, 81 S.Ct. 1343, 6 L.Ed.2d 306 (1961), cited by both Arthur and Glenda, supports this view. *Lester* interpreted section 22(k) of the Code, which at that time required the parties to a divorce decree to "fix" by a "written instrument" the exact portion of support payments allocable to child support. These "fixed" amounts were then excludable from the receiving spouse's gross income. *Id.* at 300 n. 1, 81 S.Ct. at 1344 n. 1. In rejecting the Commissioner's argument that the statutory requirement for specificity could be satisfied by ascertaining the subjective intent of the parties, the Court made the following observation:

> ficiaries.... All these things must be 'clearly specif[ied]' for a domestic relations order ... to qualify for the statutory exception." 42 F.3d at 1084 (second alteration in original).

---

8. The *Wheaton* court candidly acknowledged the shortcomings of the divorce stipulation: "[The stipulation] does not give the boys' address, name the plans to which it applies, or specify the percentage division between the designated bene-

[I]t was the intention of Congress, in enacting § 22(k) ... to eliminate the uncertain and inconsistent tax consequences resulting from the many variations in state law.... The statutory requirement is strict and carefully worded. It does not say that "a sufficiently clear purpose" on the part of the parties is sufficient to shift the tax. It says that the "written instrument" must "fix" that "portion of the payment" which is to go to the support of the children.... All of these considerations lead to the conclusion that if there is to be certainty in the tax consequences of such agreements the allocation to child support made therein must be "specifically designated" and not left to determination by inference or conjecture.

*Lester*, 366 U.S. at 301, 303, 306, 81 S.Ct. at 1345, 1346, 1347. We believe this analysis is equally applicable to the present case. Congress' mandate in section 414(p)(2) that a QDRO "must clearly specify certain facts" is no less specific than the provision in *Lester* requiring the parties to "fix" by "written instrument" the amounts allocable to child support. Accordingly, we conclude that section 414(p)(2) should be accorded its plain meaning, and not interpreted so as to allow the parties to omit the requested information whenever it is convenient or even perhaps logical to do so.

We must now determine whether the Agreement contains the "clearly specified" facts contemplated by section 414(p)(2). The Agreement states that Glenda is to receive "[c]ash of One Million Dollars ... from Husband's share of the Arthur C. Hawkins, D.D.S. Pension Plan," and that Arthur "shall immediately allow [Glenda] to take possession of the property transferred [to her] by this Agreement." This language is sufficiently precise under section 414(p)(2). First, the Agreement enables Glenda to receive a cash payment in the amount of $1

million, and therefore indicates clearly "the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee." *See* I.R.C. § 414(p)(2)(B). Second, to the extent that Glenda was entitled to the $1 million cash payment "immediately," the Agreement satisfactorily denotes "the number of payments or period to which [the] order applies"—*i.e.*, one immediate cash payment. *See* I.R.C. § 414(p)(2)(C).[9] Third, the Agreement clearly refers to the "Arthur C. Hawkins, D.D.S. Pension Plan" as the relevant plan from which the distribution is to be made and thus section 414(p)(2)(D)'s identification requirement is satisfied. The only remaining requirement under section 414(p)(2) is that the domestic relations order recite the name and last known mailing address of both the participant and the alternate payee. *See* I.R.C. § 414(p)(2)(A). However, the court below stated that Glenda conceded that the name and address requirement was not necessary because the plan administrator clearly possessed that information. The court cited the Senate Report accompanying the REA legislation, *see* S.Rep. No. 575, 98th Cong., 2d Sess. 20 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547, 2566, and in light of Glenda's concession, held that the name and address requirement was satisfied. *See Hawkins*, 102 T.C. at 76. Glenda does not challenge that holding on appeal and thus we do not address the correctness of the Tax Court's ruling in this regard. Accordingly, we conclude that the Agreement complies with all of the section 414(p)(2) specificity requirements.

### III.

Because we conclude the Agreement as incorporated into the Dissolution Decree both: (1) creates and/or recognizes Glenda's right as an alternate payee to a portion of Arthur's benefits under the Plan; and (2)

---

9. Glenda makes much of the fact that she did not receive her settlement in one lumpsum distribution, but rather in installments over a period of three months. However, the Agreement itself recognizes a right in Glenda to receive an immediate $1 million lumpsum cash distribution, even if the proceeds were not actually paid out in this manner. The fact that Arthur, as Plan administrator, chose to make the payment in install-

ments and Glenda was willing to accept the installment payments does not alter the fact that the Agreement, on its face, provides for payment all at once. The Agreement as incorporated into the Dissolution Decree must be evaluated under its plain terms to see if it qualifies as a QDRO; the subsequent actions of the parties do not render a clear obligation ambiguous.

clearly specifies the necessary facts set forth at section 414(p)(2), we hold that it is a QDRO. Accordingly, we **REVERSE** the judgment of the United States Tax Court. In particular, we **REVERSE** the grant of summary judgment in favor of the Commissioner and order that judgment be entered in favor of Arthur C. Hawkins in case No. 94–9011. Consequently, we also **REVERSE** the grant of summary judgment in favor of Glenda R. Hawkins and order that judgment be entered in favor of the Commissioner in case No. 94–9009. These cases are **REMANDED** for entry of judgment as indicated.