Shirley W. STEWART, Plaintiff–Appellant,

v.

THORPE HOLDING COMPANY PROFIT SHARING PLAN, Thomas A. Carpenter, Thorpe Holding Company, Defendants–Appellees.

No. 98–55746.

United States Court of Appeals, Ninth Circuit.

Submitted Nov. 4, 1999[1]

Decided March 31, 2000

---

1. The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

Lawrence D. Rohlfing, Santa Fe Springs, California, for the plaintiff-appellant.

Donna D. Melby, Yvonne D. Arvanitis, Kirk C. Jenkins, Sedgwick, Detert, Moran & Arnold, Los Angeles, California, for the defendants-appellees.

Before: PREGERSON, NOONAN, and O'SCANNLAIN, Circuit Judges.

PREGERSON, Circuit Judge:

This case arises under the Employee Retirement Income Security Act of 1974 (ERISA), as amended by the Retirement Equity Act of 1984 ("REA"). The REA was designed to protect the financial security of ex-spouses and dependants after divorce. *See Boggs v. Boggs*, 520 U.S. 833, 845, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997); *Ablamis v. Roper*, 937 F.2d 1450, 1453 (9th Cir.1991). When Appellant Shirley Stewart divorced Richard Nielsen in

1989, a California court issued a Marital Dissolution Order, which, *inter alia,* awarded Stewart her community property share in Nielsen's interest in an ERISA profit sharing pension plan ("the ERISA Plan"). At that time, Nielsen was not only a participant in the ERISA Plan, but also one of the Plan's four trustees, with fiduciary responsibility for its administration.

Despite Stewart's right to receive her community property share in Nielsen's interest in the ERISA Plan, defendants Thorpe Holding Company (Nielsen's former employer), Thorpe Holding Company Profit Sharing Plan (the ERISA Plan), and Thomas A. Carpenter (one of four trustees of the ERISA Plan with fiduciary responsibility for its administration) failed to distribute to Stewart her share in Nielsen's interest in the ERISA Plan. Instead, they distributed to Nielsen his entire interest in the ERISA Plan.

Stewart brought this action, seeking her share of Nielsen's interest in the ERISA Plan. The district court granted summary judgment for the defendants. The court summarily ruled that Stewart lacked standing to bring her ERISA claim because her Marital Dissolution Order purportedly did not satisfy some of the requirements of a "Qualified Domestic Relations Order" (QDRO) under ERISA.

Because we conclude that Stewart does have standing to bring her claim under the facts of this case, we reverse the district court's grant of summary judgment. Any arguable defects in the Marital Dissolution Order's language were not fatal. The Marital Dissolution Order does qualify as a QDRO as a matter of law. Even assuming that the Marital Dissolution Order failed to qualify as a QDRO, Stewart nevertheless has standing to bring this action because, by failing to perform their fiduciary duties

under ERISA, defendants denied Stewart the opportunity to protect her rights and interests as an alternate payee under 29 U.S.C. § 1056(d)(3)(G), (H).

## I.

## BACKGROUND

On July 24, 1989, Shirley Stewart[2] divorced Richard C. Nielsen pursuant to a Marital Dissolution Judgment and Order of the Los Angeles County Superior Court. The Marital Dissolution Order incorporated the executory terms of the Marital Settlement Agreement signed by Nielsen and Stewart. It awarded Stewart, *inter alia,* a one-half community property share in Nielsen's interest in the ERISA Plan.[3] At the time of the divorce, Nielsen was an employee of Defendant Thorpe Holding Company ("Thorpe Holding"), a participant in Thorpe Holding's ERISA Plan, and one of the Plan's four trustees, with fiduciary responsibility for its administration.

Two months after the Marital Dissolution Order was filed in state court, Defendant Thomas A. Carpenter ("Carpenter"), one of the Plan's other trustees, wrote a letter to Kemper Financial Services (the mutual fund holder for the Plan) at Nielsen's request, asking Kemper to transfer 9,225.197 shares (or half of the shares in the ERISA pension account) from Nielsen's pension account to Stewart. Carpenter's letter included Stewart's current mailing address of 8109 Michigan Avenue, Whittier, CA 90602. This mailing address corresponded to the address of the family residence awarded to Stewart by the Marital Dissolution Order. For reasons unknown, the transfer was never made. Stewart apparently had no knowledge of Carpenter's letter to Kemper. Moreover,

---

**2.** Shirley Stewart changed her name from Shirley Nielsen after her divorce.

**3.** Specifically, the Marital Dissolution Order provides in pertinent part that: "The holder of the pension Thorpe Holding Company PS Plan is ordered to pay [Stewart] as and for said pension plan one-half of the community

interest therein." The Marital Dissolution Order also recites the date of separation as January 1, 1988, and the number of community shares in the Plan to be 17,295.47. The Marital Dissolution Order further states that the value of these shares as of March 5, 1989 was $9.70 per share.

the record suggests that the defendants had no further contact with Stewart until, at the earliest, April of 1990.

In March 1991, Stewart contacted Carpenter concerning the transfer of her community property interest in the ERISA Plan. On May 8, 1991, Carpenter wrote Stewart a letter informing her that she needed to complete "an application" before the transfer could be made. Carpenter's letter made no reference to the Marital Dissolution Order, to the requirements under ERISA for a valid QDRO, or to the Plan's procedures for determining whether it constituted a valid QDRO.

In early 1992, Nielsen retired from Thorpe Holding and requested that his pension account be liquidated. On December 14, 1992, Carpenter directed the ERISA Plan's portfolio manager to transfer half of the shares in Nielsen's ERISA pension account to Nielsen's personal I.R.A. account and to "liquidate the remaining shares" and distribute the proceeds to Nielsen directly. Defendants thus distributed to Nielsen the entire ERISA pension account, including those shares awarded to Stewart by the Marital Dissolution Order, despite their knowledge of her adjudicated right to those shares.

Stewart filed an action in district court on March 28, 1997, seeking her community property share in Nielsen's interest in the ERISA plan pursuant to the Marital Dissolution Order. Thorpe Holding filed a motion for summary judgment, alleging, *inter alia,* that the Marital Dissolution Order was not a QDRO within the meaning of ERISA and that Stewart lacked standing to assert her claim in federal court. The district court granted summary judgment in favor of Thorpe Holding and dismissed Stewart's action for lack of standing. Stewart timely appeals. We have jurisdiction over the final decision of the district court under 28 U.S.C. § 1291.

## II.

### STANDARD OF REVIEW

■■■ Standing is a question of law reviewed de novo. *See Schultz v. PLM Int'l,*

*Inc.,* 127 F.3d 1139, 1141 (9th Cir.1997). Summary judgment is also reviewed de novo. *See Robi v. Reed,* 173 F.3d 736, 739 (9th Cir.1999). "Viewing the evidence in the light most favorable to the nonmoving party, [we] determine[ ] whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* The district court's "interpretation of ERISA is a question of law reviewed de novo." *Wetzel v. Lou Ehlers Cadillac Group Long Term Disability Ins. Program,* 189 F.3d 1160, 1163 (9th Cir.1999). The district court's findings of fact are reviewed for clear error. *See* Fed.R.Civ.P. 52(a); *Lawyer v. Department of Justice,* 521 U.S. 567, 580, 117 S.Ct. 2186, 138 L.Ed.2d 669 (1997).

## III.

### DISCUSSION

#### A. *Historical Overview of ERISA*

A brief overview of ERISA's design is necessary to put Stewart's and the defendants' contentions in the proper context.

■■■ Congress enacted the Employee Retirement Income Security Act of 1974 to establish a comprehensive federal scheme for the protection of pension plan participants and their beneficiaries. *See American Tel. & Tel. Co. v. Merry,* 592 F.2d 118, 120 (1979). Its "most important purpose" was to "assure American workers that they may look forward with anticipation to a retirement with financial security and dignity, without fear that this period of life will be lacking in the necessities to sustain them as human beings within our society." *Smith v. Mirman,* 749 F.2d 181, 182 (4th Cir.1984) (quoting from S.Rep. No. 93–127, 93d Cong., 2d Sess. (1974), *reprinted in* U.S.C.C.A.N., at 4639, 4849 (1974)) (internal quotation marks omitted). To ensure that an employee's accrued benefits would be available upon retirement, ERISA requires all plans to include anti-assignment provisions. *See* 29 U.S.C. § 1056(d)(1) (1990).

Further, ERISA's preemption provision specifically provides that ERISA supercedes any state law regarding employee benefit plans. *See* 29 U.S.C. § 1144(a) (1985). In light of ERISA's preemption and anti-assignment provisions, the question initially arose whether ERISA prevented state courts from entering domestic relations orders that sought to garnish retirement benefits to enforce alimony or child support obligations. *See generally Tenneco, Inc. v. First Virginia Bank of Tidewater,* 698 F.2d 688 (4th Cir.1983). The majority of courts addressing this issue concluded that ERISA did not prevent such assignments. *See, e.g., Operating Engineers', etc. v. Zamborsky,* 650 F.2d 196, 198 (9th Cir.1981); *Stone v. Stone,* 632 F.2d 740, 743 (9th Cir.1980) (holding that a former spouse has standing to bring a claim to enforce a state community property division).

Congress resolved any uncertainty concerning the authority of state courts to adjudicate marital dissolutions and to affect ERISA pension plan benefits, when it enacted the Retirement Equity Act of 1984, Pub.L. 98–397, 98 Stat. 1426 (codified as amended 26 U.S.C. § 417). The REA amended ERISA by creating an exception to its anti-assignment provisions for state "domestic relations orders" (commonly known as marital dissolution orders) that meet the requirements of a "qualified domestic relations order" or QDRO. *See* 29 U.S.C. § 1056(d)(3)(A).

■ The QDRO exception was specifically enacted to protect the financial security of ex-spouses. *See Ablamis,* 937 F.2d at 1453 (so holding). In creating the QDRO mechanism, Congress was careful to provide that an "alternate payee under a qualified domestic relations order," i.e., an ex-spouse, is to be considered an ERISA plan "beneficiary." *See* 29 U.S.C. § 1056(d)(3)(J); *see also Boggs,* 520 U.S. at 845, 117 S.Ct. 1754 (so holding). Moreover, Congress was careful to define an "alternate payee" as "any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under the plan with respect to such participant." 29 U.S.C. § 1056(d)(3)(K). "These provisions are essential to one of REA's central purposes, which is to give enhanced protection to the spouse and dependent children in the event of divorce or separation...." *Boggs,* 520 U.S. at 847, 117 S.Ct. 1754.

■ According to 29 U.S.C. § 1056(d), a state court's domestic relations order relating to spousal property rights is a QDRO if it "creates or recognizes the existence of an alternative payee's right to ... receive all or a portion of the benefits payable" under a plan. 29 U.S.C. § 1056(d)(3)(B)(i)(I). To qualify under the statute, a marital dissolution order must specify:

  (i) the name and the last known mailing address *(if any)* of the participant and the name and mailing address of each alternate payee covered by the order,

  (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

  (iii) the number of payments or period to which such order applies, and

  (iv) each plan to which such order applies.

29 U.S.C. § 1056(d)(3)(C)(i)-(iv) (emphasis added).[4] These requirements primarily ensure that the payee designated by the domestic relations order is a legitimate

---

4. ERISA also includes three general prohibitions for a QDRO. The order may not require a plan to provide: (1) "any type or form of benefit, or any option, not otherwise provided under the plan"; (2) "increased benefits (determined on the basis of actuarial value)"; or (3) "payment of benefits to an alternate payee which are required to be paid another alternate payee under another order previously determined to be a [QDRO]." 29 U.S.C. § 1056(d)(3)(D)(i)-(iii).

alternate payee and that the domestic relations order does not increase the payment burden on the plan or mandate the assignment of benefits previously assigned by another QDRO. *See* 29 U.S.C. § 1056(d)(3)(B), (H)(i). Indeed, "[t]he purpose [of the specificity requirements] is to reduce the expense of ERISA plans by sparing plan administrators the grief they experience when because of *uncertainty concerning the identity of the beneficiary* they pay the wrong person, or arguably the wrong person, and are sued by a rival claimant." *Metropolitan Life Ins. Co. v. Wheaton,* 42 F.3d 1080, 1084 (7th Cir.1994) (citing *Carland v. Metropolitan Life Ins. Co.,* 935 F.2d 1114, 1120 (10th Cir.), *cert. denied,* 502 U.S. 1020, 112 S.Ct. 670, 116 L.Ed.2d 761 (1991)) (emphasis added).

### B. *The Marital Dissolution Order is a Valid QDRO*

In the present case, there is absolutely no "uncertainty concerning the identity of the beneficiary" under the Marital Dissolution Order. The Order clearly identifies Stewart as the "alternate payee" because it provides for her entitlement as Nielsen's ex-spouse to one-half of the community property interest in his ERISA pension plan. *See Hawkins v. Commissioner of Internal Revenue,* 86 F.3d 982, 990 (10th Cir.1996) (deeming the ex-spouse of an ERISA plan participant an " 'alternate payee' because the [marital settlement] Agreement gives her the right to receive 'all, or a portion of,' [the participant

spouse's ERISA] Plan benefits"); *see also* 29 U.S.C. § 1056(d)(3)(K) (defining an "alternate payee" as "any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under the plan with respect to such participant").

▬ In addition, the Marital Dissolution Order awards the family residence to Stewart and sets forth its address. The Order further states the percentage of the benefits to be paid to Stewart ("one-half of the community interest"), the period affected by the Order (from the date of marriage through the date of separation ("1–1–88") "[p]ursuant to *In re Brown,* 15 Cal.3d 838, 841–43, 126 Cal.Rptr. 633, 544 P.2d 561 (1976)" (en banc)), and the plan to which the Order applies ("Thorpe Holding Company PS Plan"). The Marital Dissolution Order also states the exact number of shares in the Plan that constitute the community property interest ("17,295.47") and the value of each share as of March 15, 1989 ("$9.70"). The Marital Dissolution Order therefore satisfies the four requirements of a QDRO under ERISA.[5]

▬ Nevertheless, the district court summarily ruled that the Marital Dissolution Order was not a QDRO on the grounds that it did "not contain the alternate payee's (Plaintiff's) mailing address, nor the period to which such order applies."[6] The court—and the dissent—ap-

---

5. The dissent suggests that because Stewart has filed a malpractice action against her divorce attorneys alleging their failure "to prepare a 'Qualified Domestic Relations Order' " that she has conceded that the Marital Dissolution Order is not a valid QDRO. Stewart's complaint in her malpractice action contains conclusory allegations having no binding effect on the resolution of the issues in this case. Whether the Marital Dissolution Order in this case constitutes a valid QDRO under ERISA is a question of law for this court to determine de novo. We suspect, moreover, that Stewart's motivation for swiftly filing the malpractice action springs from the applicable statute of limitations under

California law for malpractice actions, *see* Cal.Code Civ. Pro. § 340.6, and nothing else.

6. The dissent states that the Marital Dissolution Order does not qualify as a QDRO in part because it fails to specify Nielsen's last known mailing address as the plan participant. Defendants did not raise this issue in its summary judgment motion; nor did the district court rule on it or include the purported absence of Nielsen's last known mailing address as a basis for its decision. As a general rule, we do "not consider an issue not passed upon below." *Dodd v. Hood River County,* 59 F.3d 852, 863 (9th Cir.1995) (quotation marks and citation omitted); *see also United States v. Elias,* 921 F.2d 870, 874 (9th Cir.1990) (stating that we generally do not consider docu-

parently agreed with defendants that any arguable defect in the precise language of a "domestic relations order" precluded its designation as a QDRO under ERISA. Relevant case law and the history of the QDRO provisions strongly suggests that the district court was badly mistaken in exalting form over substance.

### 1. *Stewart's Mailing Address Is Sufficiently Provided in the Marital Dissolution Order*

The Marital Dissolution Order states that Stewart is to be awarded the family residence. The address for the family residence is stated in the Marital Dissolution Order as 8109 Michigan Avenue, Whittier, California. Thus, Nielsen as Stewart's ex-husband—and also as a Plan trustee and fiduciary—knew Stewart's address because he executed the Marital Settlement Agreement that is incorporated into the Marital Dissolution Order. His conduct as one of the Plan trustees in the weeks and months following the execution of the Marital Settlement Agreement further attests to his, and therefore the Plan's, knowledge of Stewart's mailing address. For example, the letter that he directed Carpenter to send to Stewart two months after the divorce was sent to the address of the family residence that the Marital Dissolution Order awarded to Stewart.

The fact that the Marital Dissolution Order does not formally declare the family residence's address as Stewart's current mailing address is not a fatal defect. The legislative history of § 1056(d)(3)(C) makes this clear:

> The Senate committee intends that an order will not be treated as failing to be a qualified order merely because the order does not specify the current mail-

ing address of the participant and alternate payee *if the plan administrator has reason to know that address independently of the order.*

S.Rep. No. 575, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.C.C.A.N., at 2547, 2566 (emphasis added).

Moreover, courts that have ruled on this issue have liberally interpreted the address requirement for a valid QDRO in light of its purpose as an "aid [to] plan administrators in identifying and locating alternate payees under a QDRO." *Tolstad v. Tolstad,* 527 N.W.2d 668, 673 (N.D. 1995). Thus, where the address of the alternate payee is "known to the plan administrator" or the plan administrator "has reason to know it independently from ... sources readily available to him," the address requirement for a QDRO is satisfied. *Stinner v. Stinner,* 520 Pa. 374, 554 A.2d 45, 49, *cert. denied,* 492 U.S. 919, 109 S.Ct. 3245, 106 L.Ed.2d 591 (1989); *accord In re Williams,* 50 F.Supp.2d 951, 959–60 (C.D.Cal.1999) (ruling that ERISA's QDRO mailing address requirement is satisfied where, as here, the address of the participant's attorney only appears on the divorce judgment and the participant and ex-spouse were in contact with each other after the divorce); *Tolstad,* 527 N.W.2d at 673 (ruling that ERISA's QDRO mailing address requirement is satisfied where "a letter in the record from [the ERISA plan administrator] to [the ex-spouse's] attorney demonstrates that [the ERISA plan administrator] was able to contact [her]"). Simply put, "[b]ut for the lack of one easily-ascertainable address, the rights of the alternate payee should not be lost." *Stinner,* 554 A.2d at 49.

Here, the Marital Dissolution Order clearly states the address of Nielsen's at-

ments or facts not presented to the district court). We may, however, consider an issue raised for the first time on appeal "in exceptional circumstances to prevent manifest injustice." *Alexopulos by Alexopulos v. Riles,* 784 F.2d 1408, 1411 (9th Cir.1986). Because defendants have offered no reason for failing to raise this issue in district court, we find no

manifest injustice in declining to address it on appeal. *See id.* The absence of any injustice is all the more true because ERISA clearly relaxes the need to specify the "last known mailing address[es]" of the participant and alternate payee by qualifying the requirement with the statement "if any." 29 U.S.C. § 1056(d)(3)(C)(i).

torney. Moreover, two months after the Marital Dissolution Order was issued, defendant Carpenter wrote a letter to Kemper Financial Services, the mutual fund holder of the ERISA Plan, instructing it to transfer 9225.197 shares to Stewart at 8109 Michigan Avenue, Whittier, CA 90602. This is the address of the family residence that was awarded to Stewart in the Order. Moreover, Carpenter, at Nielsen's request, also wrote a letter to Stewart at this address on May 8, 1991 concerning the transfer of shares owed to her. Thus, even though Stewart's address was not explicitly designated as her "current mailing address" in the Marital Dissolution Order, the Order stated her address, and it is clear that Nielsen, Carpenter, and Thorpe Holding knew it.

## 2. *The Percentage to be Paid and the Period of Time to Which the Order Applies Are Sufficiently Stated Therein*

■ The Marital Dissolution Order specifies that Stewart is to receive "one-half of the community interest" in Nielsen's ERISA plan. It further indicates that the period to which the Order applies is from the time of the marriage through the date of separation on January 1, 1988. The dissent's suggestion that the Order's "most serious defect" is its purported failure to specify "the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined," 29 U.S.C. § 1056(d)(3)(C)(ii), as well as its related [purported] failure to indicate "the period to which such order applies," *id.* § 1056(d)(3)(C)(iii), is particularly hollow given these facts and the Order's explicit reference to the seminal California case of *In re Brown,* 15 Cal.3d 838, 126 Cal.Rptr. 633, 544 P.2d 561 (1976) (en banc).

The California Supreme Court held in *In re Brown* that "[p]ension rights, whether vested or not, represent a property interest; to the extent that such rights derive from employment *during coverture,* they comprise a community asset subject to [equal] division in a dissolution proceed-

ing." 15 Cal.3d at 842, 126 Cal.Rptr. 633, 544 P.2d 561 (emphasis added). Therefore, "the community owns all pension rights attributable to employment during the marriage." *Id.* And "the period when the parties were married and living together" (which ends on the date of legal separation) is thus the period of time during which a marital dissolution order applies. *Id.* at 843, 126 Cal.Rptr. 633, 544 P.2d 561.

In this case, according to the terms of the Nielsen's ERISA Plan, the Plan did not provide for periodic payments of benefits, but instead was a "defined contribution plan" that required the employer to make annual contributions and to segregate each participant's interest into separate and discrete pension accounts. Upon the termination of Nielsen's employment, the ERISA pension account would be (and was in fact) closed, and its proceeds distributed to Nielsen in full. Thus, because no periodic payments were contemplated, there was no need for the trial court to determine the number of payments affected by the order. Instead, because the number of shares in Nielsen's ERISA account and their value could be readily ascertained, the trial court here determined, pursuant to the parties agreement, that 17,295.47 shares constituted the community portion of Nielsen's pension account as of the date of separation or January 1, 1988, and that each share had a value of $9.70 as of March 15, 1989. According to the Marital Dissolution Order, Stewart and Nielsen entered into the Marital Settlement Agreement on March 16, 1989, "at the time of trial." Because "each party [was] awarded one-half the shares," Stewart was therefore clearly entitled to $83,882.98 or 8,647.73 shares as of "the time of trial." *Cf. In re Bergman,* 168 Cal.App.3d 742, 748 n. 4, 214 Cal.Rptr. 661 (1985) ("[T]he present value of a defined contribution plan at dissolution ... is the amount of contributions made between the marriage and separation, plus accruals thereon, and all accruals thereon between the date of separation and trial of the issue.").

■ Accordingly, the district court's finding that the Marital Dissolution Order failed to determine "the period to which [it] applies," for purposes of qualifying as a valid QDRO under ERISA is mistaken. To qualify as a valid QDRO under ERISA, a domestic relations order must meet certain criteria. That criteria has been met in this case. To require more specificity than the statute itself requires " 'would defeat the purpose of the [ERISA] provision ...' " *Metropolitan Life Insurance Co. v. Marsh,* 119 F.3d 415, 422 (6th Cir. 1997) (quoting *Wheaton,* 42 F.3d at 1085).[7]

### 3. *Relevant Case Law*

The Supreme Court held in *Boggs* that ERISA's QDRO provisions were designed to protect the community property rights of ex-spouses like Stewart in ERISA pensions. *See* 520 U.S. at 847, 117 S.Ct. 1754. "These provisions are essential to one of REA's central purposes, which is to give *enhanced protection to the spouse and dependent children in the event of divorce or separation ....*" *Id.* (emphasis added). We have also recognized that ERISA's QDRO provisions were enacted because "Congress was ... concerned with the inequities that might be suffered by women who are the economic victims of divorce or separation" and determined that these provisions were necessary "[t]o protect their interests." *Ablamis,* 937 F.2d at 1454.

For this reason, other circuit courts have liberally construed the criteria by which a domestic relations order will qualify as a QDRO. *See, e.g., Marsh,* 119 F.3d 415; *Wheaton,* 42 F.3d 1080; *see also* WILLIAM P. HOGOBOOM & DONALD B. KING, CAL. PRAC. GUIDE: FAM. LAW ¶ 10:465.1b (The Rutter Group 1998) ("While there is some disagreement over

the extent to which [the Tax Code's and ERISA's] specificity requirements may be relaxed, the cases in this area all seem to allow some degree of latitude." (citing *Hawkins,* 86 F.3d at 992–93)). In *Marsh,* the Sixth Circuit held that a divorce decree, which simply stated that the participant's two children were to receive two-third's of the participant's ERISA life insurance policy "substantially complied with ERISA's requirements." 119 F.3d at 422. Although the children's "current mailing addresses" were not included in the order, the divorce decree provided "the address of the mother in whose custody they were placed." *Id.* Thus, according to the Sixth Circuit, ERISA's address requirement was met. *See id.; accord Wheaton,* 42 F.3d at 1084 (holding same). The decree also identified Metropolitan Life Insurance as the company issuing the ERISA policy to which it applied, so that requirement under ERISA was met. *See id.* Moreover, because "the decree was very clear regarding the percentage [the two children] should receive" in accordance with ERISA's requirements, any further questions the administrator had concerning the division of the proceeds between the children could be easily resolved under governing state law principles. *Id.* at 422 (citing *Wheaton,* 42 F.3d at 1085). Finally, despite the fact that the decree did not specify the "number of payments or periods for which such order applies," it still qualified as a QDRO under ERISA because, like Nielsen's defined contribution plan, the policy contemplated one payment in full. *See id.* To the Sixth Circuit, the decree lacked "no essential information"; "it [was] clear what [it] intended to be." *Id.* It therefore constituted a valid QDRO under ERISA. *See id.*

---

7. Of course, a domestic relations order that is sufficiently detailed to answer all potential questions regarding its implementation is preferred. But such detail is not required under ERISA. *See Carland,* 935 F.2d at 1119–20; *Hawkins,* 86 F.3d at 991–94; *Wheaton,* 42 F.3d at 1084; *Williams,* 50 F.Supp.2d at 960 ("As long as a formula within a plan can be clearly and easily followed, courts have not hesitated to find [ERISA's] specificity requirements satisfied despite the fact that the decree calls for some modicum of interpretation.... The default position for an administrator [with regard to such interpretation] ... would be to follow ERISA and the plan's mandates." (citations omitted)).

Similarly, in *Wheaton,* the Seventh Circuit held that a divorce decree that failed explicitly to name the plan to which the order pertained, and failed to specify how the proceeds were to be divided between alternate payees, nevertheless, was sufficient to qualify as a QDRO, because there was no ambiguity as to how to dispense the proceeds of the ERISA plan. *See id.* at 1084. In that case, the divorce decree simply referred to the plan at issue as "the life insurance which is presently carried through his/her employer." *Id.* at 1081.

In so holding, the court stated:

It is asking too much of domestic relations lawyers and judges to expect them to dot every i and cross every t in formulating divorce decrees that have ERISA implications. Ideally, every domestic relations lawyer should be conversant with ERISA, but it is unrealistic to expect all of them to be. We do not think Congress meant to ask the impossible, not the literally, but the humanly, impossible, or to make a suit for legal malpractice the sole recourse of an ERISA beneficiary harmed by a lawyer's failure to navigate the treacherous

shoals with which the modern state-federal law of employee benefits abounds. *Id.* at 1085.

Like the divorce decree in *Wheaton* and *Marsh,* the Marital Dissolution Order in the present case "clearly contains the information specified in the statute that a plan administrator would need to make an informed decision." *Id.* at 1416. Both Nielsen and Carpenter were aware of the information needed for the proper allocation of the pension benefits. Thus, the evil that QDRO's seek to remedy—"litigation-fomenting ambiguities as to *who* the beneficiaries designated by a divorce decree are"—is absent in this case. *See id.* at 1084 (emphasis added).

In questioning the holding [8] in *Wheaton,* the dissent states that it is "persuaded by the careful discussion and analysis of *Wheaton* offered by the Tenth Circuit in *Hawkins v. Commissioner of Internal Revenue,* 86 F.3d 982 (10th Cir.1996)." A more careful reading of *Hawkins,* however, should have persuaded the dissent that *Hawkins* actually militates in favor of our interpretation of ERISA's specificity requirements for a valid QDRO.[9]

---

**8.** The dissent describes the portion of the *Wheaton* opinion on which we rely as "dicta." A "supporting ground for [a] holding [in a case] ... cannot be fairly cast as dicta." *Export Group v. Reef Industries, Inc.,* 54 F.3d 1466, 1471–72 (9th Cir.1995) (citing Black's Law Dictionary, 454 (6th ed.1990) (defining "dictum" as "an observation or remark ... not necessarily involved in the case or essential to its determination")). *Wheaton* held that a divorce decree that failed to name the plan to which it applied, to specify how and when the proceeds were to be divided between alternate payees, and to explicitly state the "current mailing address" of the alternate payees, 42 F.3d at 1084–85, was nonetheless "specific enough to serve ERISA purposes," *id.* at 1085. In concluding the *Wheaton* opinion, the court stated:

To require more specificity would defeat the purpose of the provision creating an exception to inalienability for qualified domestic relations orders, at least in the present case, and for a purely theoretical gain in certainty. It is asking too much of domestic relations lawyers and judges to expect them to dot every i and cross every t in formulating divorce decrees that have

ERISA implications. Ideally, every domestic relations lawyer should be conversant with ERISA, but it is unrealistic to expect all of them to be. We do not think Congress meant to ask the impossible, not the literally, but the humanly, impossible, or to make a suit for legal malpractice the sole recourse of an ERISA beneficiary harmed by a lawyer's failure to navigate the treacherous shoals with which the modern state-federal law of employee benefits.

*Id.* It is thus misleading at best for the dissent to suggest that any part of the above quoted passage in *Wheaton* was dicta.

**9.** As a district court recently observed in *In re Williams,* 50 F.Supp.2d at 957:

Even courts which generally are more conservative in their approach to the ERISA requirements nonetheless caution against "unduly narrow" interpretations of the language within a [domestic relations order]. *Hawkins,* 86 F.3d at 989–990. In rejecting a narrower approach by the tax court, the Tenth Circuit Court of Appeals reasoned that "[n]othing in the plain language of § 414(p)(1)(A)(i) [the I.R.S. counterpart to ERISA provision] exhorts domestic rela-

As the dissent correctly points out, the Tenth Circuit in *Hawkins* disagreed with the Seventh Circuit—as do we—to the extent that the decision in *Wheaton* "seems to suggest[ ] eliminating [ERISA's QDRO specificity requirements] altogether in some cases." 86 F.3d at 992. The Tenth Circuit was particularly concerned that ERISA's requirements not "be disregarded in favor of conducting [an] ad hoc subjective inquiry" into "whether the plan administrator was aware of the parties' 'true' intentions." *Id.* Nevertheless, the Tenth Circuit in *Hawkins* recognized that "the 'primary focus' of the QDRO exception [is] to allow alienation of 'pension plan benefits when spouses [seek] enforcement of domestic support orders.'" *Id.* at 988 (quoting *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 838–39, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988)). Thus, the Tenth Circuit rejected an "unduly narrow" reading of the specificity requirements for QDROs,[10] noting that such a reading "has the potential to frustrate this important congressional purpose by making it *unreasonably difficult* for domestic relations orders to qualify as QDROs." *Id.* at 991 (emphasis added). Instead, the Tenth Circuit stated that precluding a plan participant's spouse or child "from receiving intended domestic support payments simply because the particular divorce decree failed to track the language of the statute even though *the criteria of the statute was satisfied in substance*" was an "undesirable result" that Congress did not intend. *Id.* (citing with approval *Wheaton*, 42 F.3d at 1085). We agree.

In applying these principles to the marital settlement agreement incorporated into the divorce decree at issue in *Hawkins*, the Tenth Circuit held that the divorce decree "clearly specifies the necessary facts" required by law to constitute a valid QDRO, *id.* at 993–94, despite deficiencies that the dissent suggests should be fatal. The agreement in *Hawkins* provided that the ex-spouse

> is to receive "[c]ash of One Million Dollars ... from Husband's share of the Arthur C. Hawkins, D.D.S. Pension Plan," and that Arthur "shall immediately allow [Glenda] to take possession of the property transferred [to her] by this Agreement."

*Id.* at 992 (quoting the agreement). Like the Marital Dissolution Order here, the *Hawkins* decree failed to provide the "current mailing addresses" of the participant and the alternate payee (let alone their zip code, on which the dissent places much emphasis) or to spell out in detail "the number of payments or period to which the order applies." It also provided for the participant to pay the ex-spouse her share in his pension, not the plan itself. Nevertheless, the Tenth Circuit held the decree to be a valid QDRO. *See id.* at 990–93.

Accordingly, in light *Hawkins*, *Marsh*, and *Wheaton*, it is clear that the Marital Dissolution Order in this case constitutes a valid QDRO as a matter of law, which is binding on Thorpe Holding and its ERISA Plan. On this basis, we conclude that Stewart has standing to bring this action to enforce her rights as an alternate payee under ERISA.

## IV.

### STEWART'S ALTERNATE BASIS FOR STANDING

Even assuming that the Marital Dissolution Order does not qualify as a QDRO, Stewart still has standing to bring this action under the unique facts of this case because Nielsen, Carpenter, and Thorpe Holding, by failing to meet their

---

tions lawyers literally to mimic the statutory language when drafting these agreements." *Id.* at 990.

10. The federal tax code recognizes that distributions of pension funds following divorce to an alternate payee under a valid QDRO constitutes an exception to the general rule that the "distributee" for tax purposes is the plan participant. *See Hawkins*, 86 F.3d at 987. A valid QDRO under the tax code is defined in nearly identical terms as that under ERISA. *See id.; compare* 26 U.S.C. § 414(p)(1)-(3), (8), *with* 29 U.S.C. § 1056(d)(3)(C)(i)-(iv), (K).

fiduciary duties under ERISA, denied her the opportunity to obtain a valid QDRO and protect her rights to and community property interest in Nielsen's interest in the ERISA Plan. We have held that a state court domestic relations order that distributes the community property share of an ERISA pension plan to an ex-spouse gives that ex-spouse "the right to obtain a proper QDRO." *Gendreau v. Gendreau*, 122 F.3d 815, 818 (9th Cir.1997) (holding that an ex-spouse's community property interest in her husband's ERISA pension plan "was established under state law at the time of the divorce decree" and that her husband could not defeat her "right to obtain a proper QDRO" and be paid her community property share merely by declaring bankruptcy before she obtained a proper QDRO). Moreover, ERISA assigns to plan administrators the fiduciary duty to ensure that an alternate payee's rights are protected. Accordingly, all ERISA plans must establish reasonable, written procedures to determine the qualified status of a domestic relations order, to communicate those procedures to alternate payees, and to administer the distribution of benefits under such qualified orders. *See* 29 U.S.C. § 1056(d)(3)(G).

Specifically, upon receipt of "*any* domestic relations order"—such as the Marital Dissolution Order in this case—a plan administrator must "promptly notify the participant and any other alternate payee of the receipt of such order" and advise them of "the plan's procedures for determining" whether the order is a QDRO. 29 U.S.C. § 1056(d)(3)(G)(i) (emphasis added). "[W]ithin a reasonable time after receipt of such order, the plan administrator shall determine whether such order is a [QDRO] and notify the participant and each alternate payee of [its] determina-

tion." 29 U.S.C. § 1056(d)(3)(G)(ii). Moreover, while the order's status as a QDRO is being determined, the plan administrator is required to hold and separately account for amounts that would be payable to the alternate payee if and when the order is determined to be a QDRO. *See* 29 U.S.C. § 1056(d)(3)(H)(i).[11] Should the plan administrator determine that an order does not qualify as a QDRO, the beneficiary or alternate payee may appeal the plan administrator's decision to a "*court of competent jurisdiction*" under 29 U.S.C. § 1056(d)(3)(H)(i) (emphasis added).

In the present case, according to the Summary Plan Description of the Thorpe Holding Company Profit Sharing Plan, Thorpe Holding Company appointed a "Committee" as the plan administrator with the discretionary authority to "determine when and how to pay a Participant his or her benefits under the Plan" and to "interpret[ ] the Plan documents and adopt[ ] appropriate rules for administering the Plan." And defendants Nielsen and Carpenter were two of four trustees designated as Committee members. Under ERISA, Thorpe Holding Company's Committee is a "fiduciary" of the ERISA Plan because it exercises "discretionary authority or discretionary control respecting management of such plan ... [and] discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i), (iii). Moreover, where, as here, a committee or entity is named as the plan fiduciary, the corporate officers or trustees who carry out the fiduciary functions are themselves fiduciaries and cannot be shielded from liability by the company. *See Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1459–61 (9th Cir. 1995) (rejecting the Third Circuit's ap-

---

11. This provision states that:
   During any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, *by a court of competent jurisdiction,* or otherwise), the plan administrator shall segregate in a separate account in the plan or in

   an escrow account the amounts which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order.
   29 U.S.C. § 1056(d)(3)(H)(i) (emphasis added).

proach that relieves individual officers or directors of liability as fiduciaries unless the entity that is named as the plan's fiduciary officially delegates its fiduciary duties to them).

Thus Nielsen was not only Stewart's ex-husband, he was a trustee and one of four Committee members serving as an administrator of the ERISA Plan when he executed and received as acceptable the Marital Settlement Agreement incorporated into the Marital Dissolution Order. Nielsen therefore had notice of the Order and a fiduciary duty to comply with the statutory provisions outlined above. *See* 29 U.S.C. § 1104 (setting forth the fiduciary duties of ERISA plan administrators, which include the duty to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use ..."). Furthermore, Carpenter and the other Committee members appointed to administrate the ERISA Plan, as Nielsen's co-fiduciaries, also had notice of the Order by virtue of Nielsen's notice. *See* 29 U.S.C. § 1105 (setting forth the circumstances giving rise to liability for breach by a co-fiduciary). And they had the affirmative duty to prevent Nielsen from breaching his fiduciary duties. *See, e.g., Donovan v. Walton*, 609 F.Supp. 1221, 1231 (S.D.Fla.1985) (holding that 29 U.S.C. § 1105(a) effectively imposes on every ERISA fiduciary an affirmative duty to prevent other fiduciaries from breaching their duties for which they are jointly and severally liable),[12] *aff'd. sub nom. Brock v. Walton*, 794 F.2d 586 (11th Cir.1986).

The record strongly suggests that neither Nielsen, Carpenter, nor any of the other Committee members serving as plan administrators in this case performed their fiduciary duties pursuant to 29 U.S.C. § 1056(d)(3)(G), (H). They apparently never informed Stewart of the Plan's written procedures for determining whether the Marital Dissolution Order was a QDRO, let alone the implicit decision to declare it not to be a QDRO.[13] By doing so, defendants denied Stewart the opportunity "to obtain a valid QDRO" as required by *Gendreau* and thwarted her right to appeal that determination to a "court of competent of jurisdiction" as required by 29 U.S.C. § 1056(d)(3)(H)(i). Stewart therefore has standing to bring this action in district court as a "court of competent jurisdiction," to protect her right to obtain a valid QDRO.[14]

---

12. The Marital Dissolution Order commands the "holder of the pension Thorpe Holding Company PS Plan" to transfer Stewart's community property share to her. Thorpe Holding argues that Nielsen is the "holder" of the plan and that therefore it is not liable to Stewart under the Marital Dissolution Order. This argument is specious. We held in *Gendreau* that when a plan fails to pay an alternate payee, the alternate payee's recourse is to sue to the plan administrators, not the ex-spouse. *See* 122 F.3d at 818. Accordingly, Stewart properly brought this action against Thorpe Holding.

13. We also note that defendants further breached their fiduciary duties under ERISA by distributing to Nielsen his entire interest in the ERISA plan, instead of segregating Stewart's share "in a separate account in the plan or in an escrow account" during the period in which the validity of the Marital Dissolution Order as a QDRO was in question. 29 U.S.C. § 1056(d)(3)(H)(i).

14. The dissent miscontrues our decision. We do not hold that Stewart has standing to sue defendants for violating their fiduciary duties under ERISA if a "court of competent jurisdiction" determines that her Marital Dissolution Order does not constitute a QDRO. Rather, we hold that under the plain meaning of 29 U.S.C. § 1056(d)(3)(H)(i), ERISA gives Stewart the right as an alternate payee to challenge in a "court of competent jurisdiction" the ERISA Plan's implicit determination that her Marital Dissolution Order does not qualify as a QDRO. We further hold that ERISA plan administrators cannot deny an alternate payee, such as Stewart, that right by breaching their fiduciary duties under ERISA. Finally, for the reasons discussed *supra* in Part III, we hold that the district court here erred in ruling that Stewart's Marital Dissolution Order did not constitute a valid QDRO under ERISA.

## V.

## CONCLUSION

We held in *Gendreau* that

[the wife's] interests in the pension plan (or, at a minimum, her right to obtain a QDRO which would in turn give her an interest in the plan) was established under state law at the time of the divorce decree. . . . Whether or not [the wife's] domestic relations order, as issued, was a QDRO is irrelevant: The QDRO provisions do not suggest that [the wife] has no interest in the plans until she obtains a QDRO, they merely prevent her from enforcing her interest until the QDRO is obtained.

122 F.3d at 818. Stewart's community property interest in Nielsen's pension plan was established under state law by the Marital Dissolution Order. Stewart's ability to enforce that interest against the Plan depended on her ability to present a valid QDRO. Nielsen, Carpenter, and Thorpe Holding had the fiduciary duty under ERISA to preserve Stewart's "right to obtain a valid QDRO." If they determined that the Marital Dissolution Order was not a valid QDRO, they had the fiduciary duty to afford her the opportunity to make it so or to appeal their decision to a "court of competent jurisdiction." The fact that Nielsen, Carpenter, and Thorpe Holding failed in all these respects does not defeat Stewart's rights under 29 U.S.C. § 1056(d)(3)(H)(i) and related subsections. Therefore, Stewart has standing to bring this matter before the district court.

Accordingly, we REVERSE the district court's grant of summary judgment in favor of defendants and REMAND to the district court with instructions to enter an order finding that the Marital Dissolution Order is a valid QDRO and therefore Stewart has standing to bring this action.

REVERSED and REMANDED.

---

**1.** Although not relevant here, the Secretary of Labor and plan fiduciaries also can bring

O'SCANNLAIN, Circuit Judge, dissenting:

The Employee Retirement Income Security Act ("ERISA") sets forth with specificity the standing requirements that must be satisfied by a party seeking to bring suit under the statute. Finding these requirements unmet, the district court properly dismissed Shirley Stewart's action for lack of standing. This court now reverses. Because the majority interprets ERISA in a manner inconsistent with the statute's plain meaning, I must respectfully dissent.

### I

In her action against the Thorpe Holding Company Profit Sharing Plan ("the Plan"), Stewart brought ERISA claims for (1) a declaration of her rights against the Plan, (2) an award of her claimed share in her ex-husband's interest in the Plan, and (3) appropriate relief for the Plan's breach of fiduciary duties. The threshold question, and the only question raised in this appeal, is whether Stewart has standing to bring these claims. Answering this question requires determining whether Stewart's marital dissolution order constitutes a "Qualified Domestic Relations Order" ("QDRO") within the meaning of ERISA.

### A

In order to have standing to bring ERISA claims of the type brought by Stewart, a person must be a "participant" or "beneficiary" of a covered plan. 29 U.S.C. § 1132(a)(1).[1] ERISA explicitly prohibits the assignment or alienation of pension benefits by requiring plans to include anti-assignment provisions, *see id.* § 1056(d)(1), and it preempts state law to the extent that state law calls for such assignment or alienation, *see id.* § 1144(a). *See also* John H. Langbein & Bruce A. Wolk, *Pension and Employee Benefit Law* 545–48 (2d ed.1995) (describing the antialienation rule as "[t]he bedrock principle

---

suits under ERISA for breaches of fiduciary duty. *See* 29 U.S.C. § 1132(a)(1)(B)(2).

that underlies ERISA's treatment of third party claims," and noting that "ERISA's preemption clause strongly reinforces the antialienation rule").

An exception to ERISA's rules regarding standing and anti-alienation exists in cases involving a QDRO. "A person who is an alternate payee [e.g., a former spouse] *under a qualified domestic relations order* shall be considered for purposes of any provision of [ERISA] a beneficiary under the plan." 29 U.S.C. § 1056(d)(3)(J); *id.* § 1056(d)(3)(K) (defining "alternate payee"). As a plan beneficiary, an alternate payee under a valid QDRO has standing to sue to enforce ERISA provisions. Furthermore, the payment of pension benefits to an alternate payee is permitted as authorized under a proper QDRO. *See id.* § 1056(d)(3)(A).

Not every domestic relations order is a "Qualified Domestic Relations Order" under ERISA. While this proposition is obvious, it bears repeating in the instant case. A domestic relations order constitutes a QDRO if and only if it "clearly specifies" each of the following pieces of information:

> (i) the name and the last known mailing address (if any) of the [plan] participant and the name and mailing address of each alternate payee;

> (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined;

> (iii) the number of payments or period to which such order applies; and

> (iv) each plan to which such order applies.

*Id.* § 1056(d)(3)(C). In this case, it is undisputed that Stewart is neither a participant in nor beneficiary of the Plan. Thus,

Stewart's claim rests entirely upon the QDRO exception to ERISA's standing and anti-alienation rules. The issue then becomes whether Stewart's martial dissolution order complies with all four QDRO requirements.

### B

Review of the Marital Dissolution Order dissolving the marriage of Shirley Stewart and Richard Nielsen ("the MDO") establishes that the MDO is not a proper QDRO; multiple defects prevent it from being so. Any one of these deficiencies, taken by itself, would be sufficient to defeat QDRO qualification; taken together, they clearly preclude any possibility of QDRO treatment.

Indeed, in another action, Stewart has vigorously argued that the MDO is inadequate as a QDRO. In a legal malpractice suit against her former attorneys, Stewart has alleged that they "failed to prepare a 'Qualified Domestic Relations Order' instructing the pension plan on the [marital property] division provided for in the Judgment of Dissolution of Marriage." Complaint for Damages for Attorney Malpractice at 4, *Stewart v. Bernal,* No. BC150341 (Cal.Super. Ct. filed May 20, 1996). Appearing before this court, Stewart now seeks QDRO treatment for the same order that, because of its *defects* as a QDRO, is serving as the basis for her malpractice complaint. For the reasons set forth below, it appears to me that Stewart's malpractice suit has more merit than her ERISA action.

### 1

The MDO's first inadequacy as a QDRO is its failure to specify the last known mailing address of Nielsen as plan participant.[2] Stewart attempts to cover this ob-

---

2. The MDO is deficient as a QDRO in many respects, and the district court chose to rely upon some of the MDO's other infirmities in finding that it failed to constitute a QDRO. The majority's observation that the district court rested its decision on different defects of the MDO, *see* maj. op. at 1150 n. 5, is a non-sequitur. It is well-established that we may

affirm on any basis supported by the record. *See Henry v. Gill Industries, Inc.,* 983 F.2d 943, 950 (9th Cir.1993). Furthermore, as the majority correctly points out, "[w]hether the Marital Dissolution Order in this case constitutes a valid QDRO under ERISA is a question of law for this court to determine de novo." Maj. op. at 1149 n. 4.

vious defect with two arguments: (1) because Nielsen was a committee member authorized to administer the Plan, the MDO should not be required to contain his address; and (2) the MDO, by specifying the mailing address of Nielsen's attorney, satisfied the statutory requirement.

These arguments are unsustainable in the face of contrary statutory text. A domestic relations order, in order to constitute a QDRO, must *"clearly* specif[y] ... the name and the last known mailing address (if any) *of the participant."* 29 U.S.C. § 1056(d)(3)(C)(i) (emphases added). The statute's pellucid language does *not* contain an exception for cases in which the participant is a plan trustee or administrator, nor does it permit substitution of the mailing address of the participant's *attorney* for the mailing address of the *participant.* While the rules suggested by Stewart might make good public policy, they are not the rules contained in ERISA, and courts are without authority to revise the statute as it was enacted by Congress. *See Hawkins v. Commissioner,* 86 F.3d 982, 992–93 (10th Cir.1996) (concluding that § 1056 "should be accorded its plain meaning, and not interpreted so as to allow the parties to omit the requested information whenever it is convenient or perhaps even logical to do so").

### 2

The MDO is defective as a QDRO for failing to specify with clarity the mailing address of Stewart as alternate payee. *See* 29 U.S.C. § 1056(d)(3)(C). Never without a ready response to the patent defects in her supposed QDRO, Stewart asserts—and the majority agrees—that the MDO specifies her address by awarding her "[t]he real property at 8109 Michigan Ave., Whittier, legally described as Parcel 1, City of Whittier as shown on Parcel 1, Map 5724 filed book 60, page 94 of the parcel maps in the office of the County Recorder." Stewart and the majority also point to evidence extrinsic to the MDO to argue that the Plan was independently aware of her mailing address. Such evidence is significant, they argue,

because ERISA's legislative history states that "an [otherwise qualified domestic relations order] will not be treated as failing to be a qualified order merely because the order does not specify the current mailing address of the participant and alternate payee if the plan administrator has reason to know that address independently of the order." S.Rep. No. 98–575 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547, 2566.

These arguments are unpersuasive. By its terms, the language in the MDO relied upon by Stewart merely awards her a piece of property; it never specifies that the property address is Stewart's mailing address. Simply because someone is awarded property does not mean that she will reside or continue to reside at the property. Quite tellingly, the MDO does *not* contain the zip code for the Michigan Avenue address—a fairly important part of a *mailing* address—even though it *does* contain the parcel number for the address. This fact further supports the conclusion that the MDO's reference to the Michigan Avenue address is a property award, not a clearly specified mailing address.

The majority's adoption of Stewart's reasoning makes surplusage of statutory language requiring a domestic relations order to *"clearly* specif[y]" an alternate payee's *"mailing* address," 29 U.S.C. § 1056(d)(3)(C)(i). There are real differences between (1) mere specification and *clear* specification and (2) a legal address and a *mailing* address. These differences are explicitly recognized in ERISA's text, and they deserve to be recognized by courts charged with interpreting and applying that language. The legislative history cited by Stewart cannot override clear statutory language to the contrary. *See Hawkins,* 86 F.3d at 992–93 (rejecting a party's attempt to rely upon the same legislative history).

In sum, the majority's lengthy discussion belies the simplicity of this issue. By statute, a QDRO must "clearly specif[y] ... the name and mailing address of each

alternate payee"; the MDO does not. Accordingly, the MDO is not a QDRO.

### 3

Perhaps the MDO's most serious defect is its failure to satisfy the requirement that a QDRO clearly specify "the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined," 29 U.S.C. § 1056(d)(3)(C)(ii). The MDO provides as follows:

> The holder of the pension Thorpe Holding Company PS Plan is ordered to pay to Shirley Nielsen as and for the non-holder's share of the community interest in said pension plan one-half of the community interest therein *at such times as are ordered below.*
>
> Pursuant to the terms of *In re Brown,* the date of separation is stipulated to be 1–1–88. Amount of shares in Investment Portfolio, Inc., the profit sharing plan investment co. is stipulated to be 17,295.47 as the community portion. Each party is awarded one-half the amount of said shares. The parties stipulate that the value of said shares as of 3–15–89 is $9.70 per share.

As the Plan correctly points out, the MDO does not speak to the important issue of dividends and accruals. The MDO never indicates when (if ever) the 17,295.47 shares are to cease accruing value. Although the order gives a stipulated value per share as of March 15, 1989, it does not state whether the shares claimed by Stewart are to cease appreciating as of that date—or as of January 1, 1988, "the date of separation"—or as of July 24, 1989, the date of judgment in Stewart's divorce proceeding.

Furthermore, the MDO fails to "clearly specif[y] . . . the number of payments or period to which such order applies," 29 U.S.C. § 1056(d)(3)(C)(iii); although the MDO requires payment "at such times as are ordered below," the rest of the order is silent as to the time of payment.[3] Stewart responds, somewhat lamely, that "[t]he obscurity of the math" should not affect her entitlement. This argument must fail. Under the QDRO requirements, domestic relations orders plagued by "obscur[e] math" cannot be enforced against ERISA-covered pension plans.[4]

### C

Conceding the MDO's lack of specificity, Stewart and the majority place significant weight upon *Metropolitan Life Insurance Co. v. Wheaton,* 42 F.3d 1080 (7th Cir. 1994), and *Metropolitan Life Insurance*

---

**3.** The majority claims that the dissolution decree upheld as a valid QDRO in *Hawkins* similarly failed "to spell out in detail 'the number of payments or period to which the order applies.'" Maj. op. at 1155. This is simply inaccurate. The decree in *Hawkins* provided for "immediate[ ]" payment, 86 F.3d at 993, which is far more definite than an order that provides for payment "at such times as are ordered below" but never orders the payment times.

**4.** The MDO appears to be defective as a QDRO on yet another ground. A QDRO must specify "the amount or percentage of the participant's benefits to be paid *by the plan* to each such alternate payee," 29 U.S.C. § 1056(d)(3)(C)(ii) (emphasis added), indicating that a domestic relations order, to be a QDRO, must require the payment of benefits *by the plan* (rather than the plan *participant*) to an alternate payee. The MDO in this case orders only *Nielsen,* the plan participant, to make a payment to his ex-wife. In light of the MDO's many other deficiencies, detailed discussion of this additional QDRO defect is not necessary, but its existence is worth noting.

The majority claims that the *Hawkins* court held a divorce decree to be a valid QDRO even though the decree in that case "provided for the participant to pay the ex-spouse her share in his pension, not the plan itself." Maj. op. at 1155. The majority mischaracterizes the facts of *Hawkins,* in which the divorce decree expressly awarded Glenda Hawkins $1 million " 'from' the Plan," 86 F.3d at 990 (quoting paragraph 6(a) of the divorce decree). Indeed, the *Hawkins* court explicitly rejected Glenda's argument that the decree gave rise to personal liability to her on the part of her husband (as opposed to liability on the part of his pension plan). *See id.* at 990 n. 7.

*Co. v. Marsh*, 119 F.3d 415, 421–22 (6th Cir.1997), which simply followed the *Wheaton* analysis. Stewart and the majority place particular emphasis upon the following dicta[5] from *Wheaton:* "It is asking too much of domestic relations lawyers and judges to expect them to dot every i and cross every t in formulating divorce decrees that have ERISA implications." 42 F.3d at 1085.

With respect to the *Wheaton* dicta regarding the dotting of i's and crossing of t's in the ERISA context, I am persuaded by the careful discussion and analysis of *Wheaton* offered by the Tenth Circuit in *Hawkins v. Commissioner of Internal Revenue*, 86 F.3d 982 (10th Cir.1996). In *Hawkins*, the Tenth Circuit had to determine, for purposes of allocating tax liability between two ex-spouses, whether the Hawkins's marital settlement agreement was a QDRO. Arthur Hawkins, seeking to have the agreement treated as a QDRO, relied upon the same legislative history invoked by Stewart to argue "that the requirements of [29 U.S.C. § 1056(d)(3)(C) ] need not be strictly complied with." *Id.* at 992. "In essence, Arthur's argument is that a QDRO need not clearly specify the information required by [§ 1056(d)(3)(C) ] when the plan administrator, by virtue of his independent knowledge, is already cognizant of that in-

**5.** Notwithstanding the majority's views to the contrary, *see* maj. op. at 1153 n. 7, if this language—situated in a patch of florid prose at the very end of the opinion, well after the Seventh Circuit had completed its analysis—is not dicta, then there is no such thing as dicta at all.

**6.** In *Hawkins*, 86 F.3d at 989, the Tenth Circuit rejected as "unduly narrow" the Tax Court's interpretation of the QDRO requirements of the Internal Revenue Code (which are substantively the same as the QDRO requirements of ERISA). Citing this discussion, the majority attempts to make it appear that the Tenth Circuit in *Hawkins* took a view of the QDRO requirements as relaxed as the one it now adopts. *See* maj. op. at 1155–56. Close examination of *Hawkins* shows that the Tenth Circuit did no such thing.

formation." *Id.* Arthur cited the Seventh Circuit's *Wheaton* opinion as support for his position.

The *Hawkins* court rejected Arthur's argument and his reliance upon *Wheaton*. "While we are mindful of the Seventh Circuit's concerns, we do not agree that the QDRO specificity requirements should be construed this liberally. [R]elaxing the requirements of [the statute]—or, as *Wheaton* seems to suggest, eliminating them altogether in some cases—does violence to the plain meaning of the statute." *Id.* The Tenth Circuit drew support for its position from a time-honored principle, reiterated with regularity by the Supreme Court: "[C]ourts must not read language out of a statute." *Id.* (citing Supreme Court cases). Because of its greater fidelity to the statutory text, I find the rigorous *Hawkins* analysis more persuasive than *Wheaton* and *Marsh*.[6] When viewed in light of *Hawkins*, it is clear that Stewart's MDO fails to satisfy ERISA's rather specific QDRO requirements.

## II

Stewart argues that she has standing to bring the instant action independent of the MDO's status as a QDRO. Stewart points out that ERISA requires pension plans to establish and to follow specific procedures

In *Hawkins*, the Tax Court had effectively held that (1) "to create a QDRO, the parties to an agreement must express their intent to reallocate the tax burden of a pension distribution," and (2) "the parties [must] incorporate the exact statutory terminology when drafting a domestic relations order." 86 F.3d at 989. The Tenth Circuit reversed these holdings: "Because [the QDRO requirements of the I.R.C.] require neither of these things, we believe the Tax Court's interpretation *runs counter to the plain meaning of the statute*." *Id.* (emphasis added).

Thus, contrary to the majority's suggestion, the Tenth Circuit's conclusion that the Tax Court adopted an overly narrow reading of the QDRO requirements of the Internal Revenue Code was *not* based on the court's desire to reach a certain equitable result. Rather, it was rooted firmly in the commitment of the *Hawkins* court to enforcing "the plain meaning of the statute."

for determining whether a domestic relations order is a QDRO. Plans must, *inter alia*, (1) promptly notify alternate payees of plan procedures for qualifying domestic relations orders as QDROs, (2) determine whether a domestic relations order is a QDRO "within a reasonable period after receipt of such order," and (3) segregate any funds due to the alternate payee during the period in which a QDRO determination is being made. 29 U.S.C. § 1056(d)(3)(G), (H). Stewart argues that the Plan's alleged failure to follow these procedures denied her the opportunity to obtain a QDRO and that these ERISA violations confer upon her standing to sue under ERISA.[7]

Stewart bases her argument for ERISA standing outside the QDRO framework on *Gendreau v. Gendreau*, 122 F.3d 815 (9th Cir.1997). In *Gendreau*, we held that an ex-husband's Chapter 7 bankruptcy could not discharge his ex-wife's claim against his pension plan because her claim was against the *plan*, not against him. *See id.* at 818. Thus *Gendreau*'s central holding, a bankruptcy holding rather than an ERISA holding, lacks relevance to the case at bar.

The *Gendreau* court also stated, however, that the ex-wife's domestic relations order gave her "a right to obtain a proper QDRO that could not be discharged in William's bankruptcy proceeding." The *Gendreau* court explained that "[t]he QDRO provisions of ERISA do not suggest that Colleen has no interest in the plans until she obtains a QDRO, they merely prevent her from enforcing her interest until the QDRO is obtained." *Id.* at 819.

Stewart argues, and the majority holds, that the above language gives her ERISA standing by giving her "a right to obtain a proper QDRO." *Id.* Careful examination of *Gendreau* indicates, however, that our

opinion cannot bear the weight that Stewart seeks to place upon it. We did not hold in *Gendreau* that Colleen Gendreau's defective domestic relations order by itself gave her a right that could be enforced against William Gendreau's pension plans. Rather, we held that (1) Colleen's non-QDRO gave her an "interest" in William's pension plans that was nondischargeable in bankruptcy, and (2) Colleen would have to convert her non-QDRO into a QDRO before she could vindicate her interest in William's pension plans. *See id.* at 819. These two narrow holdings of *Gendreau* cannot serve as the basis for some broad doctrine of extra-statutory, open-ended ERISA standing. If anything, our decision in *Gendreau* undermines the position of Stewart in this case. Just as the QDRO provisions "prevent[ed] [Colleen] from enforcing her interest *until the QDRO is obtained*," *id.* at 819, they similarly prevent Stewart from enforcing any interest in the Plan without a valid QDRO.

The majority points out that under § 1056(d)(3)(H), Stewart may have the right to obtain a determination of whether the MDO is a QDRO from a court of competent jurisdiction. Here, Stewart obtained such a determination: The district court held that the MDO is not a QDRO. The fact that Stewart may be entitled to an adjudication of QDRO status, however, does not give her any right to sue under ERISA for violations of its QDRO provisions once it is determined that her MDO is not a QDRO. In other words, the district court's determination that the MDO is not a QDRO deprived Stewart of standing to sue for *any* violations of ERISA—including violations of provisions relating to the proper evaluation of domestic relations orders by plan administrators. Thus, regardless of whether the Plan violated ERISA provisions regarding the establish-

---

7. The Plan denies violating ERISA's provisions regarding QDRO procedures, arguing that it did not owe Stewart any of the duties set forth in the statute. The Plan points to record evidence indicating that it never received her MDO.

Resolving this factual dispute over receipt of the MDO is not necessary. Even if the Plan did violate ERISA provisions regarding proper QDRO determination, Stewart lacks standing to bring suit for such violations in the absence of a valid QDRO.

ment of proper procedures for qualifying domestic relations orders as QDROs, Stewart lacks standing to sue for any such violations.[8]

### III

Both Stewart and the Plan make arguments based upon the various policy concerns underlying the QDRO provisions. Stewart relies upon the QDRO legislation's goal of "protect[ing] the financial security of divorcees." *Gendreau,* 122 F.3d at 817. The Plan points to the goal of protecting pension plan administrators from "litigation-fomenting ambiguities" by requiring that domestic relations orders, in order to be enforceable against plans, must give the clearest of guidance in terms of distributing plan assets. *Wheaton,* 42 F.3d at 1084.

Both of these concerns undoubtedly played an important role in the drafting and passage of the Retirement Equity Act of 1984, which amended ERISA through addition of the QDRO provisions. *See* Langbein & Wolk, *supra,* at 557–59. Regardless of the importance of these policy considerations to Congress, however, they possess very limited significance for courts. We can consider policy considerations insofar as they are manifested in clear statutory language. The task of striking a balance between conflicting policy goals has been left to the legislative, not the judicial, branch. We as judges cannot ignore the dictates of Congress in order to produce what we deem to be, from a policy perspective, a desirable result in an individual case.

Stewart is a sympathetic plaintiff, and the majority's rewriting of the QDRO requirements is, no doubt, motivated by the best of intentions. What the majority fails to realize, however, is that the days of Chancery are over.[9] We must decide cases based on the law, not on our subjective view of the equities. Our decision will affect not just Stewart's case, but many future cases brought under ERISA. I fear that the majority's judicial expansion of ERISA standing, in order to save the case of one sympathetic plaintiff, may have serious and unforeseen consequences for this extremely important area of law.

### IV

In light of the Marital Dissolution Order's many defects, the district court did not err in holding that the MDO is not a QDRO under ERISA. Stewart therefore lacked standing to sue the Plan. Any argument that the QDRO requirements are too stringent or in need of modification must be directed to Congress, not the courts. I would affirm the judgment of the district court.

---

8. Denying standing to sue under these circumstances makes perfect sense. If a plan violates ERISA rules regarding the proper evaluation of domestic relations orders as QDROs, but the alternate payee does not have a valid QDRO, the alternate payee has sustained no harm as a result of the plan's violations.

9. As aptly stated by Justice Frankfurter, "[t]his is a court of review, not a tribunal unbounded by rules. We do not sit like a kadi under a tree dispensing justice according to considerations of individual expediency." *Terminiello v. City of Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (Frankfurter, J., dissenting).