**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAVID HAMILTON; SARAH
HAMILTON, a minor,
              *Plaintiffs-Appellees,*

                    v.

WASHINGTON STATE PLUMBING &
PIPEFITTING INDUSTRY PENSION
PLAN; PLUMBERS & PIPEFITTERS
NATIONAL PENSION FUND; WESTERN
WASHINGTON U.A. SUPPLEMENTAL
PENSION TRUST,
              *Defendants-Appellants,*

MARY HAMILTON,
              *Defendant-intervenor-*
                    *Appellant.*

No. 04-35526

D.C. No.
CV-03-02438-TSZ

137

LINDA OPPEGAARD, guardian of
Sarah Hamilton,
*Plaintiff,*

and

DAVID HAMILTON; SARAH
HAMILTON, a minor,
*Plaintiffs-counter-
defendants-Appellees,*

v.

PLUMBERS & PIPEFITTERS NATIONAL
PENSION FUND,
*Defendant-cross-defendant,*

MARY HAMILTON,
*Defendant-intervenor,*

and

WASHINGTON STATE PLUMBING &
PIPEFITTING INDUSTRY PENSION
PLAN, Local Union #32,
*Defendant-cross-defendant-
Appellant.*

No. 04-35828

D.C. No.
CV-03-02438-TSZ

LINDA OPPEGAARD, guardian of
Sarah Hamilton,
                    *Plaintiff,*

            and

DAVID HAMILTON; SARAH
HAMILTON, a minor,
            *Plaintiffs-counter-*
            *defendants-Appellees,*

            v.

PLUMBERS & PIPEFITTERS NATIONAL
PENSION FUND,
            *Defendant-cross-*
            *defendant-Appellant,*

            and

MARY HAMILTON,
            *Defendant-intervenor.*

No. 04-35798

D.C. No.
CV-03-02438-TSZ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, District Judge, Presiding

Argued and Submitted
October 17, 2005—Seattle, Washington

Filed January 10, 2006

Before: Richard D. Cudahy,* Thomas G. Nelson, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

*The Honorable Richard D. Cudahy, Senior United States Circuit Judge
for the Seventh Circuit, sitting by designation.

**COUNSEL**

Ann E. Senter and Richard H. Robblee, Rinehart & Robblee, Seattle, Washington; Donald A. Cable and Neil A. Cable, Cable Langenbach Kinerk & Bauer LLP, Seattle, Washington, for the defendants-appellants.

Nicholas P. Scarpelli, Jr., Carney Badley & Spellman, P.S., Seattle, Washington; Jerome C. Scowcroft, Scowcroft Law Office, Seattle, Washington, for the plaintiffs-appellees.

Jonathan P. Meier, Sirianni Youtz Meier & Spoonemore, Seattle, Washington, for the defendant-intervenor-appellant.

---

**OPINION**

McKEOWN, Circuit Judge:

The alphabet soup world of pension benefits has spawned a dizzying array of acronyms, like ERISA, QDRO, and QPSA, and a complex web of interrelated statutory provisions. In a case of first impression, our challenge is to cut through the dense language to figure out what Congress meant in terms of surviving spouse benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 88 Stat. 832, as amended, 29 U.S.C. § 1001 *et seq*.

In the case before us, two ERISA-governed pension funds, the Plumbers & Pipefitters National Pension Fund (National Pension Fund) and the Washington State Plumbing & Pipefitting Industry Pension Plan for Local Union #32 (State Plan) (collectively the "Plans"),[1] and Mary Hamilton, the surviving spouse of plan participant Michael Hamilton, appeal the district court's summary judgment and award of attorneys' fees to Michael's children from a previous marriage, David and Sarah Hamilton (the "Children"). After Michael's pre-retirement death, Mary and the Children claimed competing rights to survivor benefits. The district court found that the marital dissolution order, which required Michael to name the Children as beneficiaries under the Plans, was a valid Qualified Domestic Relations Order ("QDRO") under ERISA that took precedence over Mary's right to a Qualified Preretirement Survivor Annuity ("QPSA").

This scenario requires us to address the intersection between a surviving spouse's statutorily-guaranteed survivor annuity, a QPSA, and a marriage dissolution order, a QDRO, that is silent with respect to surviving spouse rights. Relying on the plain language of the statute, we hold that the purported assignment of pension rights did not meet the strict requirements of a QDRO. Even if the dissolution order is liberally construed as a QDRO, under the statutory language coupled with a complementary interpretation of the plans, the surviving spouse benefit must be explicitly assigned to a former spouse in a QDRO in order to overcome the surviving spouse's right to an annuity under ERISA. Consequently, Mary, the surviving spouse, prevails over the Children in this

---

[1]The Children and Mary Hamilton also assert competing claims to benefits under a third plan, the Supplemental Pension Plan for Washington State Plumbing and Pipefitting Industry Pension Plan for Local Union #32 (the "Supplemental Plan"). Although the Supplemental Plan was a named defendant in the underlying suit, it did not appeal the district court's judgment. The district court noted that the Supplemental Plan "does not take a position on the merits of this action and agrees to pay the prevailing party."

debate over statutory construction, plain language, and plan language, and we reverse the judgment of the district court.

## BACKGROUND

The essential facts are not in dispute. Michael was a participant in the National Pension Fund, the State Plan and the Supplemental Plan. The Plans are defined benefit pension plans subject to the provisions of ERISA. Michael and his first wife, Linda Oppegaard, were divorced in April 1996. A marital dissolution order filed with the state court provided that, with regard to the Plans, Michael "shall name the children of the marriage, David and Sarah, as the beneficiaries under the pension in lieu of life insurance which he is presently unable to obtain, which obligation shall terminate when the youngest child reaches 18 years of age." The dissolution order made no reference to surviving spouse rights nor did it delineate which pension rights were at issue, the amounts to be paid or when the payments were to begin.

About two months after the divorce, Michael married Mary Hamilton. Soon after they were married, Michael named Mary as the beneficiary for death benefits payable under the National Pension Fund and State Plan.[2] Mary only asserts her rights to benefits as a result of her status as the "surviving spouse," not as the designated beneficiary. Michael died in a car accident in 2002 at the age of 49. At the time of his death, he was still married to Mary and both Children were under the age of 18. He was a fully vested participant in the Plans, had not yet retired and was not receiving pension benefits.

The Plans provide that if a vested participant dies before retirement, benefits will be paid to a surviving spouse *or*, in the event that such surviving spouse benefits are not payable, a lump sum death benefit will be paid to another beneficiary

---

[2]The record does not reflect whether Mary Hamilton was the named beneficiary under the Supplemental Plan.

designated by the plan participant. Once Mary asserted rights to surviving spouse benefits under the Plans, the Children asserted competing rights on the ground that the marital dissolution order entitled them to benefits. The National Pension Fund and the State Plan denied the Children's claims, reasoning that Mary was entitled to a surviving spouse benefit under ERISA. The Supplemental Plan took no position on the merits of the claims.

In the course of the inevitable litigation over this clash of rights, the district court granted summary judgment to the Children and entered a judgment in their favor in an amount totalling the contributions made to the Plans on Michael's behalf. The district court determined that the Plans' respective denials of the Children's claims were arbitrary and capricious because the dissolution decree was a valid QDRO under ERISA, and the designation of the Children as "alternate payees" in the QDRO took precedence over Mary's right as the surviving spouse. The court also awarded the Children attorneys' fees, costs, and prejudgment interest pursuant to 29 U.S.C. § 1132(g)(1).

## ANALYSIS

### I. STATUTORY FRAMEWORK

Congress enacted ERISA to ensure the proper administration of employee benefit plans, including pension plans, both during the years of an employee's active service and after retirement. *See Boggs v. Boggs*, 520 U.S. 833, 839 (1997). The principal object of ERISA is to "protect plan participants and beneficiaries." *Id.* at 845 (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983) ("ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employment benefit plans")); *see also* 29 U.S.C. § 1001(b) (stating that the policy of ERISA is to "protect . . . the interest of participants in employee benefit plans and their beneficiaries"). To this end, ERISA requires pension

plans to conform to a myriad of reporting, disclosure, partici-pation, vesting and funding requirements. *See* 29 U.S.C. §§ 1021-1031, 1101-1114, 1051-1086.

[1] The Retirement Equity Act of 1984 ("REA"), Pub.L. 98-397, 98 Stat. 1426, amended ERISA in two important ways with respect to surviving spouses. REA first sought to "ensure a stream of income" to surviving spouses by requiring pension plans to provide automatic surviving spouse benefits. *Boggs*, 520 U.S. at 843. Section 1055, as amended by REA, provides that if a vested participant dies before the annuity start date, leaving a surviving spouse to whom he has been married for at least one year, "a qualified preretirement survi-vor annuity [QPSA] shall be provided to the surviving spouse."[3] 29 U.S.C. § 1055(a)(2). The QPSA is an annuity for the life of the surviving spouse that must be at least fifty percent of the annuity amount which would have been payable during the joint lives of the participant and spouse. *Id.* at § 1055(e)(2). Provision of the QPSA may be waived by the participant only if the spouse consents in writing to the desig-nation of another beneficiary. *Id.* at § 1055(c)(2).[4] Applying these provisions to the case at hand, it is undisputed that Mary was Michael's "surviving spouse" at the time of his death, and Mary never consented to the designation of another bene-ficiary.

[2] REA also introduced the QDRO exception, *id.* at

---

[3]Section 1055(a)(1) states that "in the case of a vested participant who does *not* die before the annuity starting date, the accrued benefit payable to such participant shall be provided in the form of a qualified joint and survivor annuity" (emphasis added). This provision, known as the "QJSA" provision, does not apply here because Michael died prior to the annuity starting date.

[4]The survivor's annuity may be waived without spousal consent if "it is established to the satisfaction of a plan representative" that "there is no spouse, because the spouse cannot be located, or because of other such cir-cumstances as the Secretary of the Treasury may by regulations pre-scribe." *Id.* at § 1055(c)(2)(B).

§ 1056(d), which "elevates a plan participant's legal obligations, commonly to a former spouse or children of a previous marriage, over the participant's express wishes to provide for other individuals as designated beneficiaries." *Trustees of the Directors Guild of America-Producer Pension Benefits Plans v. Tise*, 234 F.3d 415, 425 (9th Cir. 2000). The QDRO is a subset of "domestic relations orders" that recognizes the right of an alternate payee to "receive all or a portion of the benefits payable with respect to a participant under the plan." 29 U.S.C. § 1056(d)(3)(B)(i)(I). If a domestic relations order qualifies as a QDRO, the designated alternate payee— "any spouse, former spouse, child, or other dependent of a participant"—shall be considered "a beneficiary under the plan." *Id.* at §§ 1056(d)(3)(J)-(K). "Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order." *Id.* at § 1056(d)(3)(A).

**[3]** In addition, the statute specifically contemplates the assignment of surviving spouse rights (i.e., a QPSA) to a "former spouse" in a QDRO:

*To the extent provided in any qualified domestic relations order—*

> (i) the former spouse of a participant shall be treated as a surviving spouse of such participant for purposes of section 1055 of this title (and any spouse of the participant shall not be treated as a spouse of the participant for such purposes)

*Id.* at § 1056(d)(3)(F)(i) (emphasis added). In crafting the QDRO exception, "Congress resolved any uncertainty concerning the authority of state courts to adjudicate marital dissolutions and to affect ERISA pension plan benefits."[5] *See*

---

[5]QDROs, unlike domestic relations orders in general, are exempt both from ERISA's anti-alienation provision, 29 U.S.C. § 1056(d)(1) ("Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated"), and ERISA's broad preemption of state law, 29 U.S.C. § 1144(b)(7).

*Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1149 (9th Cir. 2000).

Together, the surviving spouse and QDRO provisions "are essential to one of REA's central purposes, which is to give enhanced protection to the spouse and dependent children in the event of divorce or separation, and in the event of death, the surviving spouse." *Boggs*, 520 U.S. at 847. Apart from these detailed provisions, ERISA does not confer beneficiary status on nonparticipants by reason of their marital or dependent status. *Id.*

## II.   QDRO ANALYSIS

Without a doubt, the details required in a QDRO present a drafting morass for the lawyer. We recognize the concern expressed by courts and commentators that the failure of domestic relations lawyers to "navigate the treacherous shoals" of ERISA may harm potential beneficiaries. *Metropolitan Life Ins. Co. v. Wheaton*, 42 F.3d 1080 (7th Cir. 1994) (noting that "[i]deally, every domestic relations lawyer should be conversant with ERISA, but it is unrealistic to expect all of them to be"); *see also* Daniel N. Janich, *When Remarriage Muddies the Waters*, 24 FAMILY ADVOCATE 39 (2000) ("Unfortunately, failure to include a survivorship provision in the QDRO often goes undetected until the participant dies or retires, that is, when the survivor benefits irrevocably vest in the current spouse and it is too late to do anything about it."). Despite these drafting pitfalls, Congress "required that QDROs be specific and clear" because it was "concerned with reducing the expense to plan providers and protecting them from suits for making improper payments." *In re Gendreau*, 122 F.3d 815, 817-18 (9th Cir. 1997). The mandated specificity makes sense so that a pension plan is on notice of its exact obligations to a payee other than a plan participant. In practical terms, a well crafted QDRO could avoid precisely the clash of claims presented here.

**[4]** A domestic relations order[6] qualifies as a QDRO only if it meets the "specificity" requirements set forth in § 1056(d)(3)(C): (1) the order must specify the name and mailing address of the alternate payee and the affected plan participant, (2) the amount or percentage of the participant's benefits to be paid or the means by which that amount will be determined, (3) the number of payments or time period to which the order applies, and (4) each plan to which the order applies. In addition, under § 1056(d)(3)(D), a QDRO must *not* (1) require the plan to provide any type of benefit not otherwise provided, (2) require the plan to provide increased benefits, or (3) require benefits to be paid to an alternate payee which must be paid to another alternate payee under another QDRO.[7]

**[5]** We require substantial compliance with these requirements, *Tise*, 234 F.3d at 420, and have rejected an unduly narrow reading of these requirements. *Stewart*, 207 F.3d at 1155 (recognizing that such a reading may frustrate Congressional purposes "by making it *unreasonably difficult* for domestic relations orders to qualify as QDROs") (quoting *Hawkins v. Commissioner of Internal Revenue*, 86 F.3d 982, 991 (10th Cir. 1996) (emphasis added)). We have, however, also echoed the Tenth Circuit's concerns that an overly expansive interpretation may render the specificity requirements toothless. *Stewart*, 207 F.3d at 1155 (rejecting the suggestion that ERISA's specificity requirements may be eliminated alto-

---

[6]A "domestic relations order" is defined as any "judgment, decree or order" concerning "the provision for child support, alimony payments or marital property rights to a spouse, former spouse, child or other dependent of a participant" that is "made pursuant to a State domestic relations law (including a community property law)." *Id.* at § 1056(d)(3)(B)(ii)(I)-(II).

[7]The issue of whether a domestic relations order meets the statutory requirements of a QDRO, and therefore is enforceable against the pension plan, is determined in the first instance by the pension plan administrator, and, if necessary, by a court of competent jurisdiction. *See Tise*, 234 F.3d at 421; *see also* 29 U.S.C. § 1056(d)(3)(H)(I).

gether in certain cases); *Hawkins*, 86 F.3d at 992 ("Nowhere . . . has Congress implied that its factual requirements are optional"). The pivotal question is whether the dissolution order "clearly contains the information specified in the statute that a plan administrator would need to make an informed decision." *Stewart*, 207 F.3d at 1154 (internal quotation marks omitted). Here, the paucity of relevant information in the dissolution order compels a negative answer.

Exhibit A to the Decree of Dissolution is a list of property to be distributed to the husband. The only mention of the children and the pension is the cryptic reference with respect to each pension plan that the husband "shall name the children of the marriage, David and Sarah, as the beneficiaries under the pension in lieu of life insurance which he is presently unable to obtain, which obligation shall terminate when the youngest child reaches 18 years of age."

As the Plans pointed out in rejecting the Children's claim, the order requires the husband to designate the Children as beneficiaries but does not require any action by the Plans, does not assign death benefits to the Children, and does not specify when payments begin or the amount, calculation, or form of the payments.[8] Nor does the order deal with the issue of the surviving spouse annuity.

[6] The required details are not hypothetical hurdles. Under the Plans, before the Children reached maturity, Michael or his qualified beneficiary was potentially eligible for a variety of pension benefits, such as a disability pension, an early retirement pension, death benefits and survivor benefits. The

---

[8]The Plans also point out that the dissolution order does not identify the Children as "Alternate Payees" under the Plans. This deficiency alone would not have posed a particular hurdle to finding a valid QDRO. *See Hawkins*, 86 F.3d at 990 (explaining that even though the participant's former spouse was not "specifically designated" as an alternate payee in the QDRO, she clearly "come[s] within the statutory definition of an 'alternate payee' ").

dissolution order neither lays out what pension benefits are at issue nor allocates payment of the benefits.

**[7]** The district court determined that the references in the dissolution order met the requirements for a QDRO. On appeal, the Plans argue that "QDRO or no QDRO," the statute mandates payment to the surviving spouse. The dissolution order did not, in our view, qualify as a QDRO. Nonetheless, because of the ambiguity of the Plans' position on appeal—that is, whether they actually challenge the district court's finding—we give the Children the benefit of the doubt and proceed with the analysis under the statute. Absent a QDRO, the Children would not even be in a position to parse the statutory provisions.

### III. STATUTORY INTERPLAY BETWEEN QDROS AND SURVIVOR BENEFITS

**[8]** The Plans and Mary argue that under ERISA, a QDRO can divest a surviving spouse of her statutorily-guaranteed right to a QPSA only if the QDRO expressly assigns surviving spouse rights to a former spouse. *See* 29 U.S.C. §1056(d)(3)(F). This is a question of first impression in this circuit.

"In interpreting the statutes in question, '[o]ur task is to construe what Congress has enacted. We begin, as always, with the language of the statute.' " *Navajo Nation v. Dep't Health & Human Services*, 325 F.3d 1133 (9th Cir. 2003) (en banc) (quoting *Duncan v. William*, 533 U.S. 167, 172 (2001)). When looking to the plain language of a statute, "we do more than view words or subsections in isolation. We derive meaning from context, and this requires reading the relevant statutory provisions as a whole." *California ex rel. Locklear v. F.E.R.C.*, 383 F.3d 1006, 1016 (9th Cir. 2004) (internal quotation marks omitted).

**[9]** Under ERISA, "a qualified preretirement survivor annuity [QPSA] *shall be provided* to the surviving spouse," 29

U.S.C. § 1055(a)(2) (emphasis added), absent one exception —spousal consent to waiver of the benefit, *id.* at § 1055(c)(2). As the Supreme Court observed in *Boggs*, congressional concern for the "economic security of surviving spouses," is evident from the "expansive coverage of § 1055['s]" requirements, which apply to all individual account plans and defined benefit plans, *see* 29 U.S.C. § 1055(b)(1), and the requirement of spousal consent, which prevents "[e]ven a plan participant [from] defeat[ing] a nonparticipant surviving spouse's statutory entitlement to an annuity." *Boggs*, 520 U.S. at 843.

**[10]** Section 1055 must be read in conjunction with § 1056(d)(3)(F), which provides that "[t]o the extent provided in any qualified domestic relations order," surviving spouse rights may be assigned to a "former spouse." The ordinary interpretation of the phrase "to the extent provided" means that any assignment of surviving spouse rights in a QDRO must be explicit, rather than implicit. In other words, any effort to alienate surviving spouse rights in advance must be spelled out in the QDRO. The provision also makes clear that surviving spouse rights must be assigned to a "former spouse." By statutory fiat, a former spouse can be treated as "the surviving spouse" in this limited circumstance. But the bottom line is that the survivor spouse annuity is payable only to the individual qualifying as a "surviving spouse" or "former spouse."

The Children argue that § 1056(d)(3)(F) does not exhaustively delineate how a QDRO can assign surviving spouse rights, but instead exemplifies one particular scenario: where the "alternate payee" happens to be a "former spouse." The Children urge that *their* QDRO is not governed by the language of §1056(d)(3)(F). To accept this argument, we would have to assume that while Congress intended for there to be multiple ways to assign surviving spouse rights in a QDRO— e.g., to children as well as to a former spouse—the legislature decided to reference explicitly only one of those ways in

§ 1056(d)(3)(F)—the former spouse scenario—and leave us guessing about the rest—e.g., the children scenario. Such an interpretation is not only unlikely given the comprehensive nature of the QDRO provision, but it is also at odds with the mandatory language and strict spousal consent provisions of § 1055. Together these provisions make clear that Congress intended to tightly circumscribe exceptions to the mandatory surviving spouse annuity.

[11] Although § 1056(d)(3)(A) requires a pension plan to "provide for the payment of benefits in accordance with the applicable requirements of any [QDRO]," this directive does not change our conclusion. Section 1056(d)(3)(A) cannot be read in isolation as the Children suggest. A QDRO must generally be enforced, it is true. But it may intrude on a surviving spouse's preretirement annuity only in the specific manner set forth in § 1056(d)(3)(F). Giving meaning to the plain language of the statute, we conclude that Mary cannot be divested of her right to a QPSA under § 1055 unless the QDRO explicitly assigned those rights to a former spouse.[9] Here, the purported QDRO did not do so.

---

[9]In a similar vein, the Children argue that §1056(d)(3)(F) should be read as an extension of § 1056(d)(3)(C)'s specificity requirements, applicable to one particular scenario: where the "alternate payee" happens to be a "former spouse." As noted earlier, the "specificity requirements" for a QDRO are set forth in § 1056(d)(3)(C), which provides that "[a] *domestic relations order* meets the requirements of this subparagraph only if such order clearly specifies . . ." (emphasis added). By contrast, the language of § 1056(d)(3)(F) already assumes that a valid QDRO exists: "To the extent provided in *any qualified domestic relations order* . . ." (emphasis added). Thus, while § 1056(d)(3)(F) does not technically set forth another specificity requirement for a *potential* QDRO, it does require a valid QDRO to *specifically* assign surviving spouse rights.

These provisions are best viewed as a series of separate hurdles. The first hurdle is subsection C's specificity requirements, which apply no matter what type of pension right is being assigned in a dissolution order. But if parties to a dissolution order seek to assign surviving spouse rights, then the second hurdle— § 1056(d)(3)(F)—comes into play. Ultimately, the question remains the same: whether Congress intended for the second hurdle to apply whenever surviving spouse rights were at issue. We conclude that Congress did.

Although the Supreme Court has not addressed the precise issue here, our interpretation follows the logic of *Boggs*. In *Boggs*, the Supreme Court held that ERISA prohibited a non-participant spouse from making a testamentary transfer of her interest in undistributed pension plan benefits to her sons. *Boggs*, 520 U.S. at 844. The Court explained that "ERISA's silence with respect to the right of a nonparticipant spouse to control pension plan benefits by testamentary transfer provides powerful support for the conclusion that the right does not exist." *Id.* at 843, 847-48. The Court went on to note that "ERISA's solicitude for the economic security of surviving spouses would be undermined by allowing a predeceasing spouse's heirs and legatees to have a community property interest in the survivor's annuity." *Id.* at 843. To be sure, a testamentary transfer is not a QDRO. *See Alabamis v. Roper*, 937 F.2d 1450, 1455 (9th Cir. 1991). In light of the comprehensive nature of the QDRO provision, ERISA's silence as to the ability of a QDRO to override a surviving spouse's QPSA —except as set forth in § 1056(d)(3)(F)—supports the view that § 1056(d)(3)(F) is the exclusive override method, not merely illustrative, as urged by the Children.[10]

Our reading of the statute is also consistent with the interpretation of other circuits. In *Dorn v. International Bhd. of*

---

[10]The Third Circuit in *McGowan v. NJR Service Corporation* recently applied *Boggs*'s reasoning in a similar fashion to conclude that the QDRO exception to ERISA's anti-alienation provision "is to be narrowly construed" and does not permit the alienation of benefits through waiver:

> Applying [*Boggs*'s] reasoning to the case at hand, ERISA's silence with respect to the right to waive benefits supports the conclusion that such a right does not exist. The comprehensive nature of the QDRO provision suggests that Congress provided only one option to individuals in McGowan's position. In other words, the QDRO provision, which . . . give[s] rise to the strong implication that the designation of alternate payees under other circumstances (i.e., through waivers) is not consistent with the statutory scheme.

423 F.3d 241 (3rd Cir. 2005) at 249-50 (internal quotation marks omitted).

*Elec. Workers*, 211 F.3d 938, 941 n.5 and 947 (5th Cir. 2000), the Fifth Circuit concluded that while a QDRO entitled a former spouse to a portion of her ex-husband's monthly pension annuity during his lifetime, she was not entitled to a survivor's annuity under ERISA because "the domestic order nowhere designates her as the surviving or 'qualified' spouse for purposes of any survivor benefit." The Third Circuit explained in *Samaroo v. Samaroo*, 193 F.3d 185, 187 n.2 (3rd Cir. 1999), that the terms of a divorce decree were insufficient to entitle a participant's ex-wife to a preretirement surviving spouse annuity because the decree "was silent on the issue of survivor's rights." We acknowledge that these cases did not address a conflict between children of a former marriage and a surviving spouse. Like us, however, these circuits have interpreted the statute to require an explicit assignment of surviving spouse rights in a QDRO; a general designation of an alternate payee as a pension beneficiary does not serve to designate surviving spouse benefits.

It bears noting that our interpretation is consistent with Department of Labor (DOL) and Internal Revenue Service (IRS) publications that provide guidance in the drafting of QDROs.[11] The DOL has explained:

> A QDRO may provide for treatment of a former spouse of a participant as the participant's spouse with respect to all or a portion of the spousal survivor benefits that must be provided under Federal law. . . . Only a spouse or former spouse of the participant can be treated as a spouse under a QDRO. A child or other dependent who is an alternate payee under a QDRO cannot be treated as the spouse of a participant.

---

[11]The QDRO exception is codified both in the labor code and the tax code. Because "the two parallel provisions were created by the same legislative act and contain precisely the same language, they are interpreted identically." *Hawkins*, 86 F.3d at 988 n.5; *see also* I.R.C. § 401(a)(13)(B) (2005); 29 U.S.C. § 1056(d)(3).

DOL, *Appendix D - Drafting a Qualified QDRO, in* QDROS: THE DIVISION OF PENSIONS THROUGH QUALIFIED DOMESTIC RELATIONS ORDERS (Dec. 2005), *available at* http://www.dol.gov/ebsa/publications/qdros_appD.html ("DOL Guide"). The IRS offers an identical interpretation, namely that the QDRO can name only a spouse or former spouse as a beneficiary of spousal survivor rights. IRS Notice 97-11, 1997-2 I.R.B. 49, 1996 WL 747904 at app., pt. 1, § E (1997) ("IRS Notice"). Both agencies recommend that the following express language designating surviving spouse rights be included in a QDRO to effectuate the assignment of those rights to an alternate payee: "The Alternate Payee shall be treated as the Participant's spouse under the Plan for purposes of §§ 401(a)(11) and 417[12] of the Code." *Id.* at app., pt. 2, § E; DOL Guide. The agencies also caution that such an alternate payee must be a "spouse" and not a "child or other dependant of the Participant." *Id.*

Our interpretation does not render the QDRO's assignment of benefits to the Children illusory. If Michael had not remarried, or had he and Mary been married for less than a year prior to his death, the Children would have been entitled to death benefits under the terms of the Plans. Alternatively, if Michael had waived provision of the survivor spouse annuity with Mary's consent pursuant to § 1055(c)(2), the Children would have been eligible for death benefits. Perhaps the most effective way of ensuring the Children's receipt of benefits in the event of Michael's pre-retirement death (if this, in fact, was the parties' intention at the time of divorce) would have been to assign surviving spouse rights to Michael's former spouse in a QDRO, and she in turn could have transferred those benefits to the Children.

[12] In short, designating children in a QDRO as alternate payees under a pension plan can provide a myriad of potential benefits to the children, depending on their ages, the date of

---

[12]Sections 401(a)(11) and 417 of the tax code are analogous to the surviving spouse provisions in the labor code, 29 U.S.C. § 1055.

the participant's disability, retirement, or death, and the participant's marital status. But as to a preretirement surviving spouse annuity, ERISA does not permit children to be designated as alternate payees in a QDRO. Only the surviving spouse (or a former spouse properly designated) is eligible for those benefits.

The Children cite a number of cases in which courts have awarded life insurance proceeds to the alternate payee (children or former spouse) named in a QDRO over the competing claims of the participant's widow, absent an express designation of surviving spouse rights. *See Metropolitan Life Insurance Co. v. Marsh*, 119 F.3d 415, 422 (6th Cir. 1997); *Metropolitan Life Ins. Co. v. Wheaton*, 42 F.3d 1080, 1085 (7th Cir. 1994); *Carland v. Metropolitan Life Ins. Co.*, 935 F.2d 1114, 1121 (10th Cir. 1991). These cases are inapposite because life insurance policies are not subject to § 1055's surviving spouse provisions, *see* § 1055(b) ("[T]his section shall apply to . . . any defined benefit plan [and] any individual account plan . . .."). The widows in these cases each claimed benefits as a named beneficiary under the life insurance policy, not as a surviving spouse under § 1055. Thus, the analysis in these cases does not alter our conclusion.

## IV.   INTERPRETATION OF THE PLANS

Our interpretation of the effect of ERISA's requirements for payment of benefits under a QPSA also tracks the Plans' provisions and the plan administrators' interpretations of that language, which are entitled to deference. *See Nord v. Black & Decker Disability Plan*, 356 F.3d 1008, 1010 (9th Cir. 2004) (holding that a plan administrator's determinations are reviewed for an abuse of discretion where a plan gives the administrator discretionary authority to construe the terms of the plan).[13] We must uphold the plan administrators' decisions

---

[13]The Children do not dispute that the Plans give their respective plan administrators discretionary authority to interpret plan terms, nor do they contend that a serious conflict of interest affected the plan administrators' decisions which would merit de novo review. *See Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317, 1322-23 (9th Cir. 1995).

to deny the Children lump sum death benefits if they are based upon a reasonable interpretation of the plan's terms and made in good faith. *McDaniel v. The Chevron Corporation*, 203 F.3d 1099, 1113 (9th Cir. 2000). Of course, because the Plans require conformance with ERISA, this review collapses, in practical terms, into a de novo review.

Here, the Plans' provisions are clear that, in the event of a Participant's *pre-retirement* death, if a surviving spouse is entitled to an annuity then no lump sum death benefits are payable to the designated beneficiary.[14] Section 7.01 of the National Pension Fund provides:

> [A] Lump Sum Death Benefit equal to the contributions made by his Employers on his behalf shall be paid to his designated Beneficiary. However, if a Preretirement Surviving Spouse Pension is payable under Section 6.03, no Death Benefit will be paid under this Section, unless the Participant's surviving Spouse elects to receive it in accordance with Section 6.03(d). In any event, no benefits shall otherwise be payable under this Section if a Preretirement Surviving Spouse Pension is payable to the Spouse of the Participant under Section 6.03.

Similarly, §§ 7.03 and 7.05 of the State Plan provide:

---

[14]Section 7.8 of the Supplemental Plan provides:

*Beneficiaries*. A Participant may designate a Beneficiary to receive any amount payable upon the Participant's death, subject to the following rules:

  (a) Rules applying to all designations

. . .

    (2) For a married Participant the designation of a Beneficiary other than the Participant's spouse shall require the spouse's consent . . .

> [I]f a Participant is Vested and dies before retirement benefits commence . . . and no beneficiary of his is eligible for benefit payments under Section 7.01 [the Pre-Retirement Surviving Spouse Annuity] . . . , then his designated Beneficiary shall receive a lump sum death benefit. . . .

> [A] lump sum death benefit . . . shall be paid as a result of [participant's] death if he dies before the date retirement benefits commence . . . provided, however, if the Participant is less than 55 years of age at his death, and if his surviving spouse will receive a Pre-Retirement Annuity Benefit under the terms of Section 7.01, then no lump sum death benefit shall be paid under this paragraph as a result of the death of the Participant.

It is undisputed that Mary Hamilton meets the requirements for a preretirement surviving spouse annuity. Thus, the plan administrators' decisions to deny the Children lump sum death benefits were based on a reasonable interpretation of the plan language, and the district court erred in concluding that the decisions were arbitrary and capricious.

The Children point specifically to Article 6, § 6.05 of the National Pension Fund plan, which states that "[a]ny rights of a former Spouse or other alternate payee under a Qualified Domestic Relations Order, with respect to a Participant's pension, shall take precedence over those of any later Spouse or the Participant under this Article." The district court also relied on § 6.05 in determining that the National Pension Fund, by its own terms, was not obligated to pay Mary where a QDRO conferred rights on an alternate payee.

The difficulty with this interpretation is that it does not take into account that the term "Spouse" is a defined term in the Plan and is distinguished from "Qualified Spouse," another term used in Article 6. Section 6.01 defines "Spouse" and

"Qualified Spouse." Throughout Article 6, the Plan distinguishes between use of the terms. For example, § 6.01(a) provides that, in general, a pension will be paid as a "50% Husband and Wife Pension" unless "the Participant and *Spouse* elect otherwise" or "the *Spouse* is not a *Qualified Spouse*." (emphasis added.)

Section 6.05 cannot be read to trump the rights of a "Qualified Spouse" as it expressly employs the term "Spouse." Nor can it be read to mean that if the Children are deemed alternate payees, thus allowing them to defeat the rights of a later, *un*-Qualified "Spouse," that their rights take precedence over a Qualified Spouse's entitlement to a preretirement surviving spouse annuity. Section 6.03, the QPSA section, speaks only to the rights of a "Qualified Spouse." Because Mary was married to Michael "throughout the twelve months" before "the date of death," she is deemed a "Qualified Spouse," and the designation of the Children as alternate payees would not trump her rights.

The National Pension Fund points out that § 6.05 cannot be read in isolation, but must be read in conjunction with § 7.01, which states that no lump sum death benefits will be payable "if a Preretirement Surviving Spouse Pension is payable," and § 6.01(d), which states that "[a] former spouse is a 'Qualified Spouse' if . . . the former Spouse is required to be treated as a Spouse or Surviving Spouse under a Qualified Domestic Relations Order." The Fund contends that this reading is consistent with § 1056(d)(3)(F) of ERISA, which requires a QPSA to be paid to the surviving spouse unless a QDRO expressly assigns surviving spouse rights to a "former spouse."[15]

---

[15]The Fund provides substantial guidance with respect to QDRO drafting and coverage. Its brochure provides the following detailed information with respect to preretirement spouse benefits:

> The parties should note that if the Alternate Payee is named as the Surviving Spouse for the Participant's entire benefit, any subsequent spouse of the Participant will receive no benefits upon

Not only do we determine this interpretation to be reasonable, but in this case, it is the only plan interpretation consistent with ERISA's requirements.

[13] We conclude that a surviving spouse benefit must be explicitly assigned to a former spouse in a QDRO in order to overcome the surviving spouse's right to a QPSA under ERISA. The plan administrators' decisions to deny the Children benefits were based on reasonable interpretations of the Plans' terms, and the district court erred in granting summary judgment to the Children. We reverse the award of summary judgment, attorneys' fees,[16] costs, and prejudgment interest to the Children and remand this case to the district court for proceedings consistent with this opinion.

**REVERSED and REMANDED.**

---

the Participant's death. The parties should also note that if the Alternate Payee is not designated as a Surviving Spouse for at least some portion of the Participant's benefit, nothing will be payable to the Alternate Payee after the Participant's death. *For example, if the QDRO does not provide that the Alternate Payee is to be the Participant's surviving spouse for the Preretirement Surviving Spouse Pension, and if the Participant dies before the Alternate Payee has begun receiving a benefit, no benefits will be paid under the QDRO.*

The advice is unambiguous. (emphasis added.)

[16]Under 29 U.S.C. § 1132(g), a court may, in its discretion, award attorneys' fees and costs "to either party;" however, attorneys' fees and costs under § 1132(g) are ordinarily recovered by the prevailing party. *See Honolulu Joint Apprenticeship and Training Committee of United Association*, 332 F.3d 1234, 1239 (9th Cir. 2003).